# Illinois Official Reports

## Appellate Court

---

### *Khan v. Gramercy Advisors, LLC*, 2016 IL App (4th) 150435

---

| | |
|---|---|
| Appellate Court Caption | SHAHID R. KHAN; ANN C. KHAN; UVIADO, LLC; JONCTION, LLC; and LEMAN, LLC, Plaintiffs-Appellees, v. GRAMERCY ADVISORS, LLC; GRAMERCY ASSET MANAGEMENT, LLC; GRAMERCY FINANCIAL SERVICES, LLC; TALL SHIPS CAPITAL MANAGEMENT, LLC; and JAY A. JOHNSTON, Defendants-Appellants. |
| District & No. | Fourth District<br>Docket No. 4-15-0435 |
| Filed<br>Modified upon<br>denial of rehearing | June 30, 2016<br><br>October 3, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Champaign County, No. 09-L-139; the Hon. Jeffrey B. Ford, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part. |
| Counsel on Appeal | Glenn A. Stanko, of Rawles, O'Byrne, Stanko, Kepley & Jefferson, P.C., of Champaign, and Michael E. Petrella, Sean F. O'Shea (argued), and Thomas Gardner, all of O'Shea Partners LLP, of New York, New York, for appellants.<br><br>William J. Brinkmann, of Thomas, Mamer & Haughey, LLP, of Champaign, and David R. Deary, Wilson Wray, Jeven R. Sloan, W. Ralph Canada, Jr. (argued), and K. Adam Rothey, all of Loewinsohn Flegle Deary, LLP, of Dallas, Texas, for appellees. |

JUSTICE APPLETON delivered the judgment of the court, with opinion.
Justice Turner concurred in the judgment and opinion.
Justice Steigmann specially concurred, with opinion.


**OPINION**

¶ 1 The plaintiffs are Shahid R. Khan (Khan); his spouse, Ann C. Khan; and some limited liability companies in which, pursuant to the "2002 and 2003 Distressed Debt Strategies," Khan bought majority interests. The strategies proved to be ineffectual tax shelters, as the Khans later came to realize. The limited liability companies generated losses, which the Khans claimed in their individual income tax returns so as to reduce their taxable income, but after auditing their returns, the Internal Revenue Service (IRS) disallowed the losses as artificial and lacking in economic substance. Consequently, the Khans incurred genuine financial loss in the form of interest, penalties, and the amounts they had paid for the creation and implementation of the tax shelters. Now plaintiffs seek damages from defendants for inducing them, by allegedly fraudulent misrepresentations, to buy the tax shelters and to use them for the 2002 and 2003 tax years. The defendants are Gramercy Advisors, LLC (Gramercy Advisors); Gramercy Asset Management, LLC (Gramercy Asset Management); Gramercy Financial Services, LLC (Gramercy Financial); Tall Ships Capital Management, LLC (Tall Ships); and Jay A. Johnston.

¶ 2 None of these defendants is domiciled in Illinois. Therefore, they filed a motion for dismissal in the trial court, arguing that exercising personal jurisdiction over them in Illinois would violate due process. Without an evidentiary hearing, the court denied their motion, finding, on the basis of the documentary submissions, that it would be consistent with due process to subject defendants to the specific jurisdiction of Illinois. We granted defendants leave to appeal. See Ill. S. Ct. R. 306(a)(3) (eff. July 1, 2014).

¶ 3 In our *de novo* review, we find that two of the defendants, Gramercy Advisors and Johnston, have made minimum contacts with Illinois and that exercising personal jurisdiction over them would be consistent with due process. But we find no minimum contacts with Illinois by the remaining defendants, Gramercy Asset Management, Gramercy Financial, and Tall Ships. Therefore, we affirm the trial court's judgment in part and reverse it in part: as to Gramercy Advisors and Johnston, we affirm the denial of the motion for dismissal, but as to Gramercy Asset Management, Gramercy Financial, and Tall Ships, we reverse the denial of the motion for dismissal.


¶ 4 I. BACKGROUND
¶ 5 A. The Places Where the Parties Reside or Are Domiciled
¶ 6 According to the complaint, the Khans are citizens of Illinois and reside in Champaign, Illinois, and the remaining three plaintiffs—UVIADO, LLC (UVIADO); JONCTION, LLC (JONCTION); and LEMAN, LLC (LEMAN)—are Delaware limited liability companies and have their principal place of business in Houston, Texas.

¶ 7        The defendants that are limited liability companies—Gramercy Advisors, Gramercy Asset Management, Gramercy Financial, and Tall Ships—are Delaware companies and have their principal place of business in Greenwich, Connecticut, according to the complaint.

¶ 8        "On information and belief," the complaint alleges that the remaining defendant, Johnston, is a citizen of Connecticut and that he has his principal place of business in Greenwich. Johnston states, in his affidavit of April 21, 2015, that he is a comanaging member of Gramercy Advisors and that he resides in Puerto Rico.

¶ 9                              B. The Fee-Sharing Agreement Between
                              BDO Seidman, LLP, and Gramercy Advisors

¶ 10        Paul Shanbrom states as follows in his own affidavit, likewise dated April 21, 2015. From July 1987 to December 2008, he was a partner at BDO Seidman, LLP (BDO), where he was a member of the "Tax Solutions Group." (According to the complaint, BDO has its principal place of business in Chicago.) As a member of this group, Shanbrom "was specifically charged with the task of negotiating the terms of BDO's arrangement with Gramercy with regard to their joint efforts in offering tax-advantaged transactions to potential clients, including those at issue in the instant proceedings." The person at "Gramercy" he negotiated with was Johnston. (Shanbrom does not define the term "Gramercy" in his affidavit—but, again, Johnston was a comanaging member of Gramercy Advisors, and as we soon will discuss, Gramercy Advisors is the entity to which BDO paid fees pursuant to these negotiations between Shanbrom and Johnston.)

¶ 11        On January 10, 2001, Shanbrom and Johnston reached a "[n]ew deal," under which BDO and Gramercy Advisors would split the fees "charged to clients in connection with the tax-advantaged transactions jointly promoted by BDO and Gramercy[,] *** which included the tax-advantaged transaction involving distressed debt (engaged in by the Khans in the tax years 2002 and 2003)."

¶ 12        The term "[n]ew deal" is in a note handwritten by Shanbrom at the time of the negotiation and attached to his affidavit. According to this note, the "[o]ld deal" between BDO and Gramercy Advisors was 50/50 of net fees, but the "[n]ew deal" would be 66% for BDO and 34% for Gramercy Advisors, although, when it came to "[p]erformance," the split would be 20% for BDO and 80% for Gramercy Advisors.

¶ 13        Shanbrom describes the contemplated joint efforts of BDO and Gramercy Advisors as follows:

>        "As part of this fee-splitting agreement between BDO and Gramercy, it was understood and agreed to that BDO had primary responsibility for, among other things, identifying potential clients and assisting in the marketing of the Transactions and that Gramercy had primary responsibility for, among other things, handling all aspects of the investments and transactional documents necessary to implement the [t]ransactions, in addition to assisting in marketing the [t]ransactions to clients identified by BDO. It was on this basis of BDO's and Gramercy's joint efforts that BDO and Gramercy orally agreed to the division of fees and profits as outlined in my January 10, 2001, notes."

¶ 14        The record contains the printout of an e-mail, dated January 22, 2001, from Robert Jones to Judy Geiselhart, both of BDO. The subject line is "Bonus for Paul Shanbrom," and the text of the e-mail reads: "Please process a $100,000 bonus for Paul Shanbrom in recognition of his

achievement in re-negotiating the joint venture between Gramercy and Tax Solutions." (An affidavit of Todd Simmens, BDO's national managing partner of tax risk management, authenticates this e-mail as a business record of BDO.)

¶ 15                            C. The Joint Efforts of BDO and Gramercy Advisors
                                To Sell the 2002 Distressed Debt Strategy to Khan

¶ 16                                1. *The Alleged Meeting in Urbana, Illinois*

¶ 17        In his affidavit, dated April 1, 2014, Khan states the following. Around June 2001, Shanbrom, a partner at BDO—a firm that Khan describes as his and his wife's "longtime accountants"—solicited the Khans to participate in a "new Foreign Currency Derivative Strategy" (which is the subject of *Khan v. Gramercy Advisors, LLC*, 2016 IL App (4th) 150436-U, and which, to be clear, we will not consider as a suit-based contact in the present case—this case is about the 2002 and 2003 Distressed Debt Strategies, not the 2001 Foreign Currency Derivative Strategy—although, merely for the sake of a coherent narrative, we occasionally will refer to the 2001 Foreign Currency Derivative Strategy). In order that Khan could learn more about the 2001 Foreign Currency Derivative Strategy, Shanbrom "referred [him] to [']Gramercy,['] " which Khan defines in his affidavit as "Gramercy Advisors and its many affiliated entities." Shanbrom even arranged for a representative from "Gramercy" to meet with Khan at his executive office in Urbana, Illinois, in the summer of 2001 (Khan says in his affidavit). Khan cannot remember the name of the person Shanbrom brought along to this meeting in Urbana, but he remembers that Shanbrom introduced him as a "Gramercy operating partner."

¶ 18        Khan continues in his affidavit:

> "This meeting lasted between 45 minutes and one hour. During the meeting the Gramercy partner described Gramercy's investment capabilities generally and in particular with regard to distressed debt investments, and solicited my investment with Gramercy. Shanbrom and the Gramercy operating partner further represented that BDO and Gramercy had worked together on these types of investments before, had other investors lined up to participate, that the product was bullet-proof, and that prominent law firm opinions backed up the product."

¶ 19        Defendants, on the other hand, dispute that they or any agent of theirs visited Khan in Urbana. In the summer of 2001, the "Gramercy"-affiliated companies had a total of only eight officers and employees—Johnston, Robert Young, Robert Lanava, Rodd Kauffman, Robert S. Koenigsberger, Marc Hélie, Robert Rauch, and Renato Mazzuchelli—and they all have signed affidavits stating they never personally met with Khan in Illinois and that, as far as they know, none of their colleagues did, either.

¶ 20                            2. *Telephone Calls From "Gramercy" to Khan, in Illinois*

¶ 21        After this meeting in Urbana (Khan further says in his affidavit), the "Gramercy operating partner" followed up with two or three telephone calls to Khan, in Illinois, "to inform [him] that Gramercy only had one Brazilian distressed debt investment to offer at the time, ask whether [he] was interested in the entire investment, request that [he] invest additional cash (several millions) to lend further legitimacy to the investment and enhance the return on the investment, and further assure [him] that a prominent law firm opinion on the transaction

would issue." (According to the complaint, a law firm, DeCastro, West, Chodorow, Glickfield & Nass, Inc. (DeCastro), ultimately did issue opinions to Khan validating the legality of the 2002 and 2003 Distressed Debt Strategies, but instead of being an "independent" law firm, DeCastro was in a conspiracy with BDO.)

¶ 22                                    3. *The Conference Call in August 2001*

¶ 23        In August 2001, Shanbrom arranged for a conference call between Khan, himself, and Johnston "to further discuss the 2001 Foreign Currency Derivative Strategy." Khan recounts this conference call as follows:

> "12. *** Shanbrom initiated the call, Johnston joined in, and I participated in the call from my office in Illinois. During the call, I introduced myself to Johnston and told him about my Illinois-based businesses and residency. *** Johnston *** touted what he described as Gramercy's special expertise with distressed debt investments and its long history of achieving high rates of return. Johnston promised me that Gramercy could achieve results for my wife and me (and the other Plaintiffs) that few, if any, other investment firms could provide. ***
>
> ***
>
> 14. Again, before Plaintiffs ever entered into any agreements with Gramercy, during the call referenced in paragraph 12, BDO's Shanbrom and Gramercy's Johnston advised me that the 2001 Foreign Currency Derivative Strategy could yield a substantial profit and at the same time, regardless of whether we made or lost money on the investments, legally reduce Plaintiffs' capital gains and income tax burden. Both men also told me that Plaintiffs should invest additional sums of money with Gramercy, aside from the investments directly involved in the strategies, because these other investments would diversify Plaintiffs' portfolio, provide [plaintiffs] with a chance to achieve even higher rates of return, and provide even more economic substance for the 2001 Foreign Currency Derivative Strategy. They later repeated these statements with respect to the Distressed Debt Strategies (sometimes collectively referred to as the 'Strategies'). In addition to the money related to the Strategies, Shanbrom further recommended that Plaintiffs invest additional funds with Gramercy. Johnston and Shanbrom told me that any further investment would be part of the Strategies.
>
> 15. My wife and I lacked any prior knowledge in the area of these types of sophisticated investments and tax reduction strategies."

¶ 24        In his affidavit of November 13, 2014, Johnston denies that, in the telephone conversation of August 2001, he "made statements to Khan regarding the legality and tax implications of Khan and BDO's tax strategies." But he does not deny that the telephone conversation took place, nor does he otherwise contradict Khan's account of the telephone conversation, including Khan's recollection that Johnston told him the 2001 Foreign Currency Derivative Strategy and the distressed debt strategies "could yield a substantial profit."

In November 2001, Gramercy Advisors sent a proposed "Investment Management Agreement" to Khan in Illinois. After reviewing the agreement and signing it in Illinois, Khan sent it back to Gramercy Advisors in Connecticut.

In the agreement, which contained a New York choice-of-law clause but not a forum-selection clause, Khan designated Gramercy Advisors as his "attorney-in-fact," authorizing Gramercy Advisors to do various things on his behalf, *i.e.*, entering into investments; selecting, maintaining, and closing accounts with brokers; opening, maintaining, and closing bank accounts in the course of effecting trading and investment transactions; and executing all documents and taking all other actions that Gramercy Advisors considered to be necessary or appropriate to carry out its duties. The agreement further stated that all correspondence was to be mailed to Khan at his Illinois address and that his initial capital allocation to Gramercy Advisors was to be $2.5 million.

Under the heading "Limitation of Liability, Exculpation[,] and Indemnification," the investment management agreement provided as follows:

> "(c) The Investment Manager [(defined as Gramercy Advisors)] is not required to inquire into or take into account the effect of any tax laws or the tax position of the Client [(defined as Khan)] in connection with managing the Account. To the fullest extent permitted by law, neither the Investment Manager, its members[,] [n]or any of their respective affiliates and their respective partners, members, officers, directors, employees, shareholders[,] and agents shall be liable in any manner to the Client with respect to the effect of any U.S. federal, state, local[,] or any other taxes of any nature whatsoever on the Account or the Client in connection with managing the Account or in connection with this Agreement or otherwise. The Client agrees that it has consulted its own tax advisor regarding the possible tax consequences of establishing the Account or entering into any investment made under or in connection with this Agreement."

(In their brief, defendants quote section 7(c) as further saying: " '[Khan] represents and agrees that it has consulted its own tax advisor, and that neither [Gramercy Advisors] nor any of its affiliates has made any oral or written statement to [Khan], regarding the possible tax consequences of establishing the Account or entering into any investment made under or in connection with this Agreement. [Khan] further represents and agrees that it has not relied on [Gramercy Advisors] or any of its affiliates in connection with any tax advice.' " (Emphasis omitted.) Actually, that language is not in section 7(c) of the 2001 investment management agreement, although as we later will discuss, it is in section 7(c) of a subsequent investment management agreement, the one Khan entered into in 2003, and in that agreement, "Investment Manager" was defined as Gramercy Asset Management.

On November 5, 2001, the same day he signed the 2001 investment management agreement, Khan signed a letter addressed to Gramercy Advisors, in which he repeatedly referred to himself as "it" (suggesting, perhaps, that this was a form letter). The second paragraph of this letter, which defendants call a "side letter," reads as follows:

> "The undersigned further acknowledges that: (a) it has consulted with its own financial, tax[,] and legal advisors with respect to the Transactions and, in particular,

the effect of the tax laws and regulations and the impact of any notices or announcements issued by the IRS, (b) it has not relied on the Investment Manager for any financial, tax[,] or legal advice with respect to the Transactions, and (c) it shall not have any claim against the Investment Manager in the event that any tax liability, problem[,] or issue should arise in connection with the Transactions other than as a direct result of any negligence of the Investment Manager in effecting the investments pursuant to the Agreement."

¶ 31
## 2. *Step-by-Step Telephonic Instructions*
### *from Johnston and Others to Khan, in Illinois,*
### *on How To Carry Out the 2002 Distressed Debt Strategy*

¶ 32    Khan recounts in his affidavit that Johnston and other "Gramercy representatives" repeatedly telephoned him, in Illinois, to explain to him how to accomplish the various steps of the 2002 Distressed Debt Strategy. He says:

> "Gramercy's representatives also participated in many telephone conversations with me (directly and through Plaintiffs' representative) regarding the implementation of the 2002 Distressed Debt Strategy. During these telephone conversations, Gramercy's representatives, including Johnston, advised me as to the status of the 2002 Distressed Debt Strategy and Plaintiffs' investments in distressed debt and instructed Plaintiffs with respect to carrying out each of the steps of the Distressed Debt Strategies, including when to dispose of the debt. I was present in Illinois during these calls."

¶ 33
## 3. *The Steps of the 2002 Distressed Debt Strategy*

¶ 34    In their complaint, plaintiffs provide the following nutshell description of a distressed debt strategy:

> "The tax component [of the strategy] involves the contribution of distressed debts (generally assets trading substantially below their face value) from a foreign contributor to a U.S. partnership. That partnership subsequently contributes the distressed debts to lower-tier partnerships. The foreign partner then sells its interest in the lower-tier partnership to a U.S. taxpayer[,] who contributes other assets to the partnership. The tax benefit is realized when the partnership sells or exchanges the contributed distressed assets for cash or other assets."

See also IRS, "Coordinated Issue Paper—Distressed Asset/Debt Tax Shelters," LMSB-04-0407-031 (eff. April 18, 2007), *available at* www.lb7.uscourts.gov/documents/12-33671.pdf (last visited June 27, 2016).

¶ 35    When the foreign party contributes an asset to a domestic partnership, such as a distressed debt, the foreign party receives, in return, an interest in the partnership and becomes a partner (or, in the case of a limited liability company, a member). See *Superior Trading, LLC v. Commissioner*, 728 F.3d 676, 679 (7th Cir. 2013). In the hands of the partnership, the basis of the asset is the foreign partner's original basis, which is, roughly speaking, what the foreign partner originally paid for the asset. See *id.*; Black's Law Dictionary 145 (7th ed. 1999) (defining "basis" as "[t]he value assigned to a taxpayer's investment in property and used primarily for computing gain or loss from a transfer of the property").

¶ 36    Over time, assets can fluctuate in value. The value of the asset that the foreign partner contributed to the partnership might have changed since the date when the foreign partner originally acquired the asset. For example, a receivable that is "distressed"—a debt that the borrower, because of his worsening financial condition, appears increasingly unlikely to repay—will have declined in fair market value since the date when the foreign partner acquired it, because a receivable, a debt, has value only to the extent it is likely to be paid. This decline in value is a loss to the foreign partner.

¶ 37    Recognition, for tax purposes, of loss attributed to any change in the asset's value that occurred *before* the foreign partner contributed the asset to the partnership is deferred until the partnership sells the asset. See *id.* (citing 26 U.S.C. § 721(a) (2012)). If the asset is worth less than what the foreign partner paid for it, the loss in value, called "built-in loss," will be recognized only if and when the partnership sells the asset. See *id.* (citing 26 U.S.C. § 704(c)(1)(A) (2012)). If the foreign partner sells its partnership interest to a United States taxpayer before the partnership sells the contributed asset, the United States taxpayer steps into the foreign partner's shoes and will recognize the built-in loss only if and when the partnership sells the asset. See *id.* (citing 26 C.F.R. § 1.704-3(a)(7) (2012)).

¶ 38    The United States partner, however, will be able to claim a built-in loss only up to the amount of his own basis in the partnership. See *id.* (citing 26 U.S.C. §§ 704(d), 705(a)(2)(A) (2012)). Unless the United States partner has made a contribution to the partnership, his basis in the partnership will equal only the amount he paid the foreign partner for its partnership interest, and his recognition of built-in loss will be limited accordingly. See *id.* (citing 26 C.F.R. § 1.7411 (2012)). For illustration, let us say that the built-in loss associated with the asset (the distressed debt the foreign partner had contributed to the partnership) is $1 million but that the United States taxpayer paid the foreign partner only $300,000 for its partnership interest. When the partnership later sells that asset for next to nothing, the United States taxpayer's loss will be limited to $300,000—*unless*, before the partnership sells the asset, the United States taxpayer contributes, say, an additional $700,000 to the partnership, thereby increasing his basis in the partnership to a level at which he will be able to recognize the full loss of $1 million ($300,000 + $700,000). See *id.*

¶ 39    By his capital contribution to the partnership, the United States taxpayer increases his basis in the partnership, enabling him to later claim the full amount of the built-in loss when the partnership sells the asset. A distressed debt strategy is all about exploiting built-in loss in this manner. And typically, the built-in loss will be vastly greater than any actual economic loss the taxpayer himself incurred. That is the aim.

¶ 40    Specifically, how did the 2002 Distressed Debt Strategy exploit built-in loss? The first step was to find foreign companies that owned receivables that had declined precipitously in value since the foreign companies acquired them. As it happened, some Brazilian companies owned "emerging market receivables," or notes, that were worth substantially less than their face value.

¶ 41    The next step was to form domestic partnerships to which the Brazilian companies could contribute these distressed receivables. Gramercy Advisors was the managing member of three United States limited liability companies that were suitable for that purpose: PBANAN, LLC; JAKEND, LLC; and CFURDR, LLC. We will call these three limited liability companies "the lower-tier partnerships." (For purposes of taxation, limited liability companies are treated the same as partnerships. 26 C.F.R. § 301.7701-2(c)(1) (2015).) On February 11, 2002, the

Brazilian companies contributed their distressed receivables to the lower-tier partnerships in return for membership interests in those partnerships.

¶ 42    Gramercy Advisors then helped Khan establish a contractual relationship with a broker, Refco Capital Markets, Ltd. (Refco), so that Khan could buy options. On September 13, 2002, Gramercy Advisors, as Khan's attorney-in-fact under the investment management agreement of 2001, signed, on his behalf, an International Swap Dealers Association, Inc. (ISDA), master agreement with Refco. The plan was for Khan to buy options through Refco and then contribute these options to a second-tier partnership. He thereby would build up his basis in the second-tier partnership so that, ultimately, he could claim the full amount of the built-in loss after the lower-tier partnerships contributed the distressed receivables to the second-tier partnership and the second-tier partnership sold them.

¶ 43    On September 16, 2002, Tall Ships (an affiliate of Gramercy Advisors) and the lower-tier partnerships entered into an operating agreement, creating the second-tier partnership UVIADO. The lower-tier partnerships then contributed the Brazilian distressed receivables to UVIADO in return for membership interests in UVIADO.

¶ 44    On September 26, 2002, "pursuant to Gramercy's instructions and authority as [his] attorney-in-fact," Khan entered into option transactions with Refco, buying and selling options in Japanese yen (we quote from Khan's affidavit). He paid Refco a premium of $500,000, representing the difference between the $70 million in options he bought and the $69.5 million in options he sold. We say that Khan paid the premium, but, more precisely, Gramercy Advisors, as his attorney-in-fact, paid this amount to Refco out of his account.

¶ 45    On October 17, 2002, Khan entered into an ISDA master agreement with Gramercy Financial. Johnston signed the agreement on Khan's behalf, by virtue of Gramercy Advisors' authority as Khan's attorney-in-fact. That same day, pursuant to this ISDA master agreement, Gramercy Financial sold Khan "certain United Mexican States 2026 Put Options" (to quote the complaint). Lanava signed for the seller, Gramercy Financial; Koenigsberger ("Founder, Partner[,] and Chief Investment Officer at Gramercy," according to his affidavit) signed for Khan as the buyer, acting on behalf of Gramercy Advisors as Khan's attorney-in-fact.

¶ 46    On November 18, 2002, through three interest transfer agreements, which "Gramercy" sent to Khan in Illinois and which he signed in Illinois, he bought membership interests in UVIADO from the first-tier partnerships (we quote from his affidavit). He thereby stepped into the shoes of the first-tier partnerships—and ultimately into the shoes of the foreign partners—for purposes of built-in loss.

¶ 47    That same day, Tall Ships entered into a contribution agreement between Khan and UVIADO, whereby Khan contributed the Refco options to UVIADO, together with cash and other assets. These contributions increased his basis in UVIADO to the point at which he owned roughly 97% of UVIADO, with Tall Ships and the first-tier partnerships owning the remaining 3%. He also entered into an assignment agreement with UVIADO, by which he assigned to UVIADO all his interest in the options he had bought from Gramercy Financial, further increasing his basis in UVIADO. Johnston signed the assignment agreement pursuant to Gramercy Advisors' authority as Khan's attorney-in-fact.

¶ 48    On December 26, 2002, UVIADO exchanged the Brazilian distressed receivables with an unrelated third party, triggering a built-in tax loss.

¶ 49 The next step was to distribute this loss among the members of UVIADO. That was done through the preparation of income tax forms. Gramercy Advisors hired Financial Strategy Group, a Tennessee accounting firm, to prepare the 2002 UVIADO income tax return and the corresponding Schedules K-1 for UVIADO's members, including the Khans.

¶ 50 Although Gramercy Advisors was the entity that hired Financial Strategy Group, Tall Ships technically was UVIADO's "tax matters partner," according to UVIADO's 2002 tax return. Under section 1.39 of UVIADO's "Amended and Restated Operating Agreement," dated November 18, 2002, Tall Ships was the " 'Sole Manager' " of UVIADO, and the sole manager had the exclusive right to make tax determinations. Section 3.8 empowered and obligated Tall Ships, as the sole manager, to make determinations as to the allocations of tax losses among members of UVIADO, and the members agreed not to gainsay those determinations. Section 3.8 provided:

"All matters concerning the valuation of Securities and other assets of the Company, the allocation of Net Profit, Net Loss[,] and items of taxable income, gains, losses[,] and deductions among the Members, including taxes thereon, and accounting procedures not expressly provided for by the terms of this Agreement shall be determined in good faith by the Sole Manager, which determination shall be final and conclusive as to all Members."

¶ 51 Financial Strategy Group prepared the 2002 UVIADO income tax return "on behalf of Gramercy Advisors, LLC," "using summary data sheets provided by [Gramercy Advisors] and reviewed by BDO Seidman as the source documents for the information to be reported in the returns." (We are quoting from exhibit No. 5 of Michael A. Shaul's deposition. He is a member of Financial Strategy Group, and exhibit No. 5 is an "engagement letter," dated March 18, 2003, and addressed from him to "J. Robert Young" of "Gramercy Advisors" in Greenwich, Connecticut.) After completing the 2002 UVIADO income tax return and associated Schedules K-1, Financial Strategy Group sent them to Gramercy Advisors.

¶ 52 Gramercy Advisors in turn mailed a 2002 UVIADO Schedule K-1 to the Khans, in Illinois. According to Shaul's deposition, this Schedule K-1 stated that Khan owned almost 97% of UVIADO, and it "show[ed] a substantial loss of 69.8 million dollars." This was the loss, the Khans' loss, purportedly generated by the 2002 Distressed Debt Strategy.

¶ 53 As Khan says in his affidavit:

"In April 2003, Plaintiffs received a copy of UVIADO's 2002 [Schedule] K-1 from Gramercy at my home address in Champaign, Illinois. *** UVIADO's 2002 tax return and corresponding K-1 comprised the mechanism which directed Plaintiffs to claim millions of dollars in losses on our tax returns, including my and my wife's returns. As had been explained to me by Gramercy and BDO, without the [Schedule] K-1 which Gramercy actually mailed to Plaintiffs in Illinois, Plaintiffs would have lacked the independent tax return support to realize the purported benefits of the 2002 Distressed Debt Strategy."

## E. The IRS Audit

¶ 55 In 2005, the IRS audited the Khans' income tax returns for 2002 and 2003. Afterward, the IRS decided that the distressed debt strategies were abusive tax shelters and that the losses they purported to generate, being contrived and lacking economic substance, were invalid and did

not have the effect of reducing the Khans' taxable income. Consequently, the IRS assessed millions of dollars of back taxes, interest, and penalties against the Khans, all of which they paid from Illinois.

### F. BDO and Gramercy Advisors Split Khan's Fee
for the 2002 Distressed Debt Strategy

On October 10, 2002, Johnston sent an invoice to Robert Jones in BDO's Chicago office, requesting "per [their] agreement" $400,000 as Gramercy Advisors' share of Khan's fee for the 2002 Distressed Debt Strategy. The letterhead of the invoice consists of the icon of a pillared and arched doorway and, underneath that icon, the company name, "Gramercy Advisors." On October 16, 2002, Jones approved payment to Gramercy Advisors in that amount.

### G. BDO and "Gramercy's" Joint Efforts To Sell
the 2003 Distressed Debt Strategy to Khan

There was more than one distressed debt strategy. There was the 2002 Distressed Debt Strategy, which we have just finished describing, and then there was the purportedly new and improved version, the 2003 Distressed Debt Strategy. Khan says in his affidavit:

> "In the spring of 2003, Shanbrom and BDO advised me that BDO and Gramercy had redesigned the 2002 Distressed Debt Strategy to give its clients, like my wife and me, a much greater chance of making even more money from the distressed debt investments. By this time, Plaintiffs had been Gramercy clients for many years, and Gramercy engaged in continued efforts to solicit more business from us. Gramercy had been communicating, corresponding, and dealing with us in Illinois on a regular basis. BDO and Gramercy further advised me—in communications with me when I was in Illinois—that the 2003 Distressed Debt Strategy was legal and provided the same tax benefits found in the 2002 Distressed Debt Strategy. So, based on the advice of BDO, Gramercy (being my attorney-in-fact) and others, Plaintiffs decided to participate in the 2003 Distressed Debt Strategy."

(Again, the IRS audit was not until 2005.)

### H. The Implementation of the 2003 Distressed Debt Strategy
#### 1. *The Investment Management Agreement of 2003*

On May 21, 2003, Khan entered into an investment management agreement with Gramercy Asset Management, in which he agreed to "allocate to the Account the initial amount of $7,000,000." He appointed Gramercy Asset Management as his attorney-in-fact, giving it the same powers he had given Gramercy Advisors under the investment management agreement of 2001. The investment management agreement of 2003 contained the same exculpatory provision, paragraph 7(c), as the investment management agreement of 2001—except that paragraph 7(c) in the agreement of 2003 included the additional language (applied to Gramercy Asset Management) that defendants mistakenly say was in the agreement of 2001.

At the same time Khan signed the investment management agreement of 2003, he signed a "side letter" addressed to Gramercy Asset Management and stating:

"The undersigned further represents and acknowledges that: (a) it has consulted with its own financial, tax[,] and legal advisors with respect to the Transactions and, in particular, the effect of the tax laws and regulations and the impact of any notices or announcements issued by the IRS, (b) neither the Investment Manager nor any of its affiliates, including, but not limited to, Gramercy Advisors LLC, Tall Ships Capital Management LLC, Hatteras Capital Management LLC[,] or Outer Banks Capital Management LLC, ('Affiliates') nor any of the members, officers, employees[,] or agents of the Investment Manager of Affiliates (individually, an 'Affiliated Party') has made any oral or written statement to the undersigned as to the potential tax consequences of the Transactions[,] and the undersigned has not relied on the Investment Manager, any Affiliate, or any Affiliated Party for any financial, tax[,] or legal advice with respect to the Transactions, and (c) it shall not have any claim against the Investment Manager, any Affiliate[,] or any Affiliated Party, in the event that any tax liability, problem[,] or issue should arise in connection with the Transactions other than as a direct result of any gross negligence of the Investment Manager, any Affiliate[,] or Affiliated Party, in effecting the investments pursuant to the Agreement."

¶ 64             2. *The Steps of the 2003 Distressed Debt Strategy*

¶ 65      On March 25, 2003, the Brazilian companies contributed "certain emerging market receivables," or notes, to ANGLAISE LLC (ANGLAISE) in exchange for membership interests therein. Gramercy Asset Management was the sole managing member of ANGLAISE.

¶ 66      On April 15, 2003, Gramercy Asset Management and ANGLAISE entered into an operating agreement, by which they formed JONCTION, of which Gramercy Asset Management likewise was the sole managing member. That same day, ANGLAISE contributed the Brazilian distressed receivables to JONCTION in return for a membership interest therein.

¶ 67      "Gramercy" then sent to Khan, in Illinois, a proposed interest transfer agreement for his signature (we quote from Khan's affidavit). On May 21, 2003, he signed it, buying an 89.01% interest in JONCTION from ANGLAISE.

¶ 68      That same day, JONCTION (of which Khan now was the majority owner) contributed the Brazilian distressed receivables to LEMAN in return for a 98.9% interest in LEMAN, with Gramercy Asset Management owning the remaining 1.1% interest.

¶ 69      An "Amended and Restated Operating Agreement" for JONCTION, sent to Khan in Illinois and signed by him there on May 21, 2003, established the Khans' address in Champaign, Illinois, as the "principal office" of JONCTION. As a result, Gramercy Asset Management became a member of a limited liability company that had its principal office in Illinois.

¶ 70      On December 26, 2003, LEMAN exchanged the Brazilian distressed receivables for receivables held by Gramercy Financial. This exchange triggered a built-in loss.

¶ 71      Gramercy Advisors again hired Financial Strategy Group, this time to prepare the 2003 return and Schedule K-1 relating to JONCTION. Again, Gramercy Advisors provided Financial Strategy Group with "summary data sheets" so that Financial Strategy Group could insert the data from them into the tax forms. After preparing the JONCTION return and the

Schedule K-1, Financial Strategy Group sent them to Gramercy Advisors, which in turn sent them to the Khans, in Illinois.

¶ 72 In their federal and Illinois individual income tax returns for 2003, the Khans claimed the losses set forth in the Schedule K-1. After the audit of 2005, the IRS disallowed these losses generated by the 2003 Distressed Debt Strategy, just as it disallowed the losses generated by the 2002 Distressed Debt Strategy. Consequently, the Khans had to pay back taxes, interest, and penalties for tax year 2003 as well.

¶ 73 I. Gramercy Advisors Requests From BDO Its Share of
Khan's Fee for the 2003 Distressed Debt Strategy

¶ 74 On June 11, 2003, Johnston sent an invoice to Jones at BDO's office in Chicago, requesting payment of another $400,000, this time for the 2003 Distressed Debt Strategy. The letterhead of this invoice says merely "Gramercy," but it includes the same icon of the pillared and arched doorway, and at the bottom of the invoice is the address 20 Dayton Avenue, Greenwich, Connecticut, which we know from elsewhere in the record is the address of Gramercy Advisors.

¶ 75 II. ANALYSIS

¶ 76 A. General Jurisdiction and Specific Jurisdiction

¶ 77 General or all-purpose jurisdiction is "jurisdiction over a defendant based on a forum connection unrelated to the underlying suit (*e.g.*, domicile)." *Walden v. Fiore*, 571 U.S. ___, ___ n.6, 134 S. Ct. 1115, 1121 n.6 (2014). The forum state has general jurisdiction over a foreign corporation if its "affiliations with the State are so continuous and systematic as to render [it] essentially at home in the forum State." (Internal quotation marks omitted.) *Daimler AG v. Bauman*, 571 U.S. ___, ___, 134 S. Ct. 746, 749 (2014).

¶ 78 Specific or case-linked jurisdiction, by contrast, "depends on an affiliatio[n] between the forum and the underlying controversy (*i.e.*, an activity or occurrence that takes place in the forum State and is therefore subject to the State's regulation)." (Internal quotation marks omitted.) *Walden*, 571 U.S. at ___ n.6, 134 S. Ct. at 1121 n.6. As our supreme court has said:

> "Specific jurisdiction requires a showing that the defendant purposefully directed its activities at the forum state and the cause of action arose out of or relates to the defendant's contacts with the forum state. [Citation.] Under specific jurisdiction, a nonresident defendant may be subjected to a forum state's jurisdiction based on certain single or occasional acts in the state but only with respect to matters related to those acts. [Citation.]" (Internal quotation marks omitted.) *Russell v. SNFA*, 2013 IL 113909, ¶ 40.

¶ 79 The parties agree there is no general jurisdiction over defendants in this case. The question is whether there is specific jurisdiction.

¶ 80 B. The Illinois Long-Arm Statute
and Constitutional Due Process

¶ 81 The Illinois long-arm statute, section 2-209 of the Code of Civil Procedure (735 ILCS 5/2-209 (West 2014)), governs the exercise of personal jurisdiction by an Illinois court over a nonresident. *Russell*, 2013 IL 113909, ¶ 29. In the past, Illinois courts used a two-step analysis

when deciding whether to exercise personal jurisdiction over a nonresident: they first decided whether a specific provision of section 2-209 was satisfied, and if it was, only then did they proceed to the further question of whether exercising personal jurisdiction over the nonresident would be consistent with the due process clauses of the United States and Illinois Constitutions (U.S. Const., amend. XIV; Ill. Const. 1970, art. I, § 2). *Russell*, 2013 IL 113909, ¶ 29.

¶ 82　　On September 17, 1989, however, a statutory amendment went into effect, adding a catchall provision—subsection (c) (Ill. Rev. Stat. 1991, ch. 110, ¶ 2-209(c))—to section 2-209. *Russell*, 2013 IL 113909, ¶ 30. Under the catchall provision, a court "may also exercise jurisdiction on any other basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States." Ill. Rev. Stat. 1991, ch. 110, ¶ 2-209(c) (now 735 ILCS 5/2-209(c) (West 2014)). Thus, the catchall provision makes the long-arm statute coextensive with the United States and Illinois Constitutions, "collaps[ing] the jurisdictional inquiry into the single issue of whether a defendant's Illinois contacts are sufficient to satisfy federal and Illinois due process." *Russell*, 2013 IL 113909, ¶ 30.

¶ 83　　　　　　　　　　　　　　C. The Fiduciary Shield Doctrine

¶ 84　　Johnston invokes the fiduciary shield doctrine, arguing it would be unfair and unreasonable under Illinois law to exercise personal jurisdiction over him, considering that the contacts he allegedly made with Illinois were in his capacity "as a Gramercy employee" rather than in his individual capacity.

¶ 85　　The fiduciary shield doctrine does not protect Johnston. The reason is that he was serving his own personal interests, not those of an employer. According to the supreme court's explication of due process in *Rollins v. Ellwood*, 141 Ill. 2d 244, 280 (1990), Illinois courts lack personal jurisdiction over any "individual who seeks the protection and benefits of Illinois law, not to serve his personal interests, but to serve those of his employer or principal." But *cf. Calder v. Jones*, 465 U.S. 783, 790 (1984) ("[T]heir status as employees does not somehow insulate them from jurisdiction."); *Hope Clinic for Women, Ltd. v. Flores*, 2013 IL 112673, ¶ 47 (the Illinois due process clause is interpreted in "limited lockstep" with its federal counterpart). As a comanaging member of Gramercy Advisors, Johnston presumably was entitled to share in its profits, as a partner would be entitled to share in the profits of a partnership (see Conn. Gen. Stat. § 34-222 (2015); Del. Code Ann. tit. 6, § 18-503 (2012)), and consequently he must have been acting in his own personal interest, as much as in the interest of Gramercy Advisors, when he helped Shanbrom sell the 2002 and 2003 Distressed Debt Strategies to Khan. *Cf. Rollins*, 141 Ill. 2d at 279-80 ("Because Ellwood's conduct in Illinois was a product of, and was motivated by, his employment situation and not his personal interests, we conclude that it would be unfair to use this conduct to assert personal jurisdiction over him as an individual."). The fiduciary shield doctrine is intended to protect employees, such as the police officer in *Rollins*, who, in making contact with the forum state, were merely following orders on pain of being fired or otherwise disciplined. See *id.* at 280. The doctrine is inapplicable to proprietors, partners, or comanaging members of a limited liability corporation. Johnston is hardly comparable to Baltimore police sergeant John S. Ellwood, the individual shielded in *Rollins*.

D. The Procedure for Adjudicating
Disputes Over Personal Jurisdiction

¶ 87        Because the trial court decided the jurisdictional question solely on the basis of the documentary submissions, our standard of review is *de novo*. See *Aasonn, LLC v. Delaney*, 2011 IL App (2d) 101125, ¶ 10. *De novo* review means using the same analysis a trial court would use (*Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011)); therefore, we have to be clear on the burden of coming forward and other procedural rules governing the determination of personal jurisdiction in the trial court.

¶ 88        The procedure begins with the complaint. If, on its face, a complaint lacks factual allegations on the basis of which an Illinois court could legitimately exercise personal jurisdiction over the defendant, the complaint is subject to dismissal upon the defendant's motion, even if the motion is unaccompanied by a supporting affidavit. *Heller Financial, Inc. v. Conagra, Inc.*, 166 Ill. App. 3d 1, 5 (1988). Unless the record—such as the facial deficiency of the complaint—already supports the defendant's objection to personal jurisdiction, the defendant must do so by an affidavit (735 ILCS 5/2-301(a) (West 2014)), which must be "made on the personal knowledge of the [affiant]" (Ill. S. Ct. R. 191(a) (eff. Jan. 4, 2013)). The trial court will accept as true any facts in the defendant's affidavit that the plaintiff does not contradict by a counteraffidavit (*TCA International, Inc. v. B&B Custom Auto, Inc.*, 299 Ill. App. 3d 522, 531 (1998); *Johnson v. Ortiz*, 244 Ill. App. 3d 384, 388 (1993)), which likewise must be "made on the personal knowledge of the [affiant]" (Ill. S. Ct. R. 191(a) (eff. Jan. 4, 2013)).

¶ 89        But what if the plaintiff's affidavit and the defendant's affidavit clash on a material issue of fact? The supreme court says: "Any conflicts in the pleadings and affidavits must be resolved in the plaintiff's favor ***." *Russell*, 2013 IL 113090, ¶ 28. Defendants question the fairness of a procedure by which the plaintiff's affidavit automatically, with no questions asked, trumps the defendant's affidavit. They are concerned that "[s]uch a rule would allow a plaintiff to hale any defendant into court simply by filing one perjurious affidavit, which cannot be condoned." *TCA International, Inc.*, 299 Ill. App. 3d at 533.

¶ 90        The short answer is that we have no power to review decisions by the supreme court. Perhaps, however, we can somewhat allay defendants' concerns about procedural fairness by observing that the relevant factual issues on which the affidavits clash really are not dispositive; that is, they do not *have* to be resolved in this appeal, as the jurisdictional question does not *turn* on their resolution.

¶ 91        What are the factual issues that emerge from the competing affidavits? We see two relevant issues, neither of which is critical to the outcome in this appeal.

¶ 92        First, Khan claims in his affidavit that a "Gramercy operating partner" visited him in Urbana, Illinois, in the summer of 2001. On the other hand, all eight persons who worked for "Gramercy"-affiliated companies in the summer of 2001 insist, in their affidavits, that they never met with Khan in Illinois and that, as far as they know, none of their coworkers did so, either.

¶ 93        Second, Khan claims in his affidavit that during a telephone conversation in August 2001, Johnston represented to him that the *2001 Foreign Currency Derivative Strategy* could "legally reduce Plaintiffs' capital gains and income tax burden." But further down in the same paragraph of his affidavit, Khan states: "They [(Shanbrom and Johnston)] later repeated these

statements with respect to the Distressed Debt Strategies (sometimes collectively referred to as the 'Strategies')." (It is unclear what Khan means by "later," whether later in the conference call or on some later occasion.) On the other hand, Johnston, in his affidavit of November 13, 2014, denies that in the 2001 conference call he "made statements to Khan regarding the legality and tax implications of Khan and BDO's tax strategies."

¶ 94    *Russell* would require us to hold that Khan's affidavit automatically prevails. See *Russell*, 2013 IL 113909, ¶ 28. Actually, however, we can sidestep these two factual issues because, as it happens, personal jurisdiction does not turn on their resolution. Other minimum contacts justify the exercise of personal jurisdiction over Johnston and Gramercy Advisors. In a moment, we will discuss these other minimum contacts.

¶ 95    E. The Most Recent Decision by the Supreme Court
on Personal Jurisdiction, *Walden*

¶ 96    1. *The Lesson of* Walden

¶ 97    Defendants repeatedly invoke the United States Supreme Court's statement in *Walden*, 571 U.S. at ___, 134 S. Ct. at 1125, that when deciding whether to exercise personal jurisdiction over a nonresident defendant, a court must not "[attribute] a plaintiff's forum connections to the defendant and [make] those connections decisive in the jurisdictional analysis." (Internal quotation marks omitted.) Defendants criticize the trial court in this case for "*not [addressing] Walden at all*, even though it is the most recent authority from the [United States] Supreme Court addressing the minimum contacts standard for specific jurisdiction." (Emphasis in original.)

¶ 98    Let us consider *Walden*, then, and see what light it sheds on this appeal. In *Walden* (*id.* at ___, 134 S. Ct. at 1119), the respondents, Gina Fiore and Keith Gipson, were at the airport in San Juan, Puerto Rico, getting ready to fly back to Nevada, where they resided, when agents of the Transportation Security Administration searched their carry-on bags and found $97,000 in cash. The respondents explained to the agents that they had been gambling at the El San Juan, a casino in San Juan. *Id.* at ___, 134 S. Ct. at 1119. Although the respondents were cleared for departure from San Juan, a law enforcement officer at the San Juan airport alerted the Drug Enforcement Administration (DEA) in Atlanta, Georgia, that the respondents were on their way there to catch a connecting flight to Las Vegas, Nevada, and that they were carrying $97,000 in cash. *Id.* at ___, 134 S. Ct. at 1119.

¶ 99    When the respondents arrived at the airport in Atlanta, the petitioner, Anthony Walden, an agent of the DEA, approached them and questioned them about the large amount of cash they were carrying. *Id.* at ___, 134 S. Ct. at 1119. The respondents explained to him they were professional gamblers and that the cash consisted of their winnings and the reserve out of which they gambled. *Id.* at ___, 134 S. Ct. at 1119. After using a drug-sniffing dog, the petitioner seized the cash and told the respondents it would be returned to them if they later proved they had obtained it from a legitimate source. *Id.* at ___, 134 S. Ct. at 1119. The respondents boarded their flight to Nevada without their $97,000. *Id.* at ___, 134 S. Ct. at 1119.

¶ 100   The next day, the respondents' attorney in Nevada telephoned the petitioner in Georgia, requesting the return of the cash. *Id.* at ___, 134 S. Ct. at 1119. Also, on two occasions over the next month, the respondents' attorney sent the petitioner documentation showing the legitimate origin of the cash. *Id.* at ___, 134 S. Ct. at 1119.

¶ 101 Sometime after seizing the cash, the petitioner helped draft a probable cause affidavit in support of a proposal that the respondents forfeit the cash to the federal government as ill-gotten gains, and he forwarded the affidavit to a United States Attorney in Georgia. *Id.* at ___, 134 S. Ct. at 1119. Ultimately, no forfeiture complaint was ever filed, and the DEA returned the cash to the respondents some six months after the petitioner seized it. *Id.* at ___, 134 S. Ct. at 1120.

¶ 102 The respondents then sued the petitioner in the federal district court of Nevada, alleging he had violated their rights under the fourth amendment (U.S. Const., amend. IV) by seizing their cash without probable cause, writing a false affidavit, keeping their cash after concluding it had not come from drug-related activity, and withholding exculpatory information from the United States Attorney in Atlanta. *Walden*, 571 U.S. at ___, 134 S. Ct. at 1120.

¶ 103 The district court granted the petitioner's motion for dismissal, concluding that his seizure of the cash in Georgia did not justify the exercise of personal jurisdiction over him in Nevada. *Id.* at ___, 134 S. Ct. at 1120 "The court concluded that even if [the] petitioner [had] caused harm to [the] respondents in Nevada while knowing they lived in Nevada, that fact alone did not confer jurisdiction." *Id.* at ___, 134 S. Ct. at 1120.

¶ 104 The federal court of appeals disagreed with the district court. It reasoned that the petitioner had " 'expressly aimed' his submission of the allegedly false affidavit at Nevada by submitting the affidavit with knowledge that it would affect persons with a 'significant connection' to Nevada." *Id.* at ___, 134 S. Ct. at 1120 (quoting *Fiore v. Walden*, 688 F.3d 558, 581 (9th Cir. 2011)). Delaying the return of the cash had caused " 'foreseeable harm' " to the respondents in Nevada (*id.* at ___, 134 S. Ct. at 1120 (quoting *Fiore*, 688 F.3d at 582)), and in the opinion of the court of appeals, it would be "otherwise reasonable" of the district court in Nevada to exercise personal jurisdiction over the petitioner (*id.* at ___, 134 S. Ct. at 1120). Therefore, the court of appeals reversed the district court's judgment and held that the district court "could properly exercise jurisdiction over 'the false probable[-]cause affidavit aspect of the case.' " *Id.* at ___, 134 S. Ct. at 1120 (quoting *Fiore*, 688 F.3d at 577).

¶ 105 The Supreme Court disagreed with the court of appeals and agreed with the district court. *Id.* at ___, 134 S. Ct. at 1121. Exercising personal jurisdiction over a nonresident had to be consistent with due process, the Supreme Court explained, and although due process did not require the nonresident's physical presence in the forum state, the nonresident had to have made "minimum contacts" with the forum state "such that the maintenance of the suit [would] not offend traditional notions of fair play and substantial justice." (Internal quotation marks omitted.) *Id.* at ___, 134 S. Ct. at 1121. The exercise of specific jurisdiction was consistent with due process only if "the defendant's suit-related conduct [had] create[d] a substantial connection with the forum State." *Id.* at ___, 134 S. Ct. at 1121.

¶ 106 The Supreme Court emphasized two points about this substantial connection with the forum state. "First, the relationship [had to] arise out of contacts that the 'defendant *himself*' create[d] with the forum State." (Emphasis in original.) *Id.* at ___, 134 S. Ct. at 1122 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). The communications—the telephone call and the letters—that the respondents' attorney, in Nevada, had directed to the petitioner, in Georgia, did not count as minimum contacts because they were not contacts by the petitioner himself with Nevada. *Id.* at ___, 134 S. Ct. at 1125.

¶ 107 "Second, [the Supreme Court's] 'minimum contacts' analysis look[ed] to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside[d]

there." *Id.* at \_\_\_, 134 S. Ct. at 1122. Although the petitioner knew that the respondents were Nevada residents and that his actions in Georgia probably would affect them financially in Nevada (just as it would have affected them financially in whatever state they happened to reside in), it did not follow that he had made contact with *Nevada. Id.* at \_\_\_, 134 S. Ct. at 1124-25. All of his suit-specific conduct had been in Georgia. *Id.* at \_\_\_, 134 S. Ct. at 1124. He "never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to Nevada." *Id.* at \_\_\_, 134 S. Ct. at 1124. He did things exclusively in Georgia that harmed the respondents, who happened to reside in Nevada. *Id.* at \_\_\_, 134 S. Ct. at 1124. To base the exercise of personal jurisdiction merely on the foreseeability of harm to Nevada residents, without requiring any minimum contacts with Nevada itself, would "improperly [attribute] a plaintiff's forum connections to the defendant and [make] those connections decisive in the jurisdictional analysis." (Internal quotation marks omitted.) *Id.* at \_\_\_, 134 S. Ct. at 1125.

¶ 108      This was not to say that effects felt within the forum state were always irrelevant; it was just that these effects had to arise from the defendant's contacts with the forum state. *Id.* at \_\_\_, 134 S. Ct. at 1125. Effects felt by the plaintiff in the forum state are not necessarily minimum contacts by the defendant with the forum state. For example, *A* could pick *B*'s pocket while *B* is visiting Florida, and after *B* returns home to South Carolina, he might well, as a consequence, suffer a paucity of funds there—he might default on his cell phone contract—but that does not mean that *A* had any contact with South Carolina. That hypothetical illustration is *Walden* stripped to its essentials. As the Supreme Court put it:

> "[M]ere injury to a forum resident is not a sufficient connection to the forum. Regardless of where a plaintiff lives or works, an injury is jurisdictionally relevant only insofar as it shows that the defendant has formed a contact with the forum State. The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." *Id.* at \_\_\_, 134 S. Ct. at 1125.

¶ 109             *2. The Application of* Walden *to the Three Affiliates of Gramercy Advisors*

¶ 110             a. The Necessity of a Defendant-by-Defendant Analysis of Contacts, Even If the Defendants Are Affiliated Companies

¶ 111      Gramercy Asset Management, Gramercy Financial, and Tall Ships are limited liability companies, and they are affiliates of a fourth limited liability company, Gramercy Advisors. See Black's Law Dictionary 59 (7th ed. 1999) (defining "affiliate" as "[a] corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation"). All four of these limited liability companies are organized under the laws of Delaware, and therefore the laws of Delaware "govern [their] organization and internal affairs and the liability of [their] managers, members, and their transferees." 805 ILCS 180/45-1(a) (West 2014) ("Law governing foreign limited liability companies"). Under Delaware law, a member of a limited liability company cannot be held liable for the debts, obligations, and liabilities of the limited liability company. Del. Code Ann. tit. 6, § 18-303(a) (2013). Thus, even if Delaware limited liability companies are affiliated—even if one limited liability company is a member of (that is, owns an interest in) another limited liability company—the two limited liability companies are nevertheless separate legal entities. See *id.*

¶ 112      Because Delaware limited liability companies, though affiliated, are separate legal entities, the minimum contacts of one are not the minimum contacts of another. "The requirements of

- 18 -

*International Shoe* [*Co. v. Washington*, 326 U.S. 310, 316 (1945),] *** must be met as to each defendant over whom a state court exercises jurisdiction," and a court errs by "considering the 'defending parties' together and aggregating their forum contacts in determining whether it ha[s] jurisdiction." *Rush v. Savchuk*, 444 U.S. 320, 331-32 (1980); see *International Shoe*, 326 U.S. at 316 ("[D]ue process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." (Internal quotation marks omitted.) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). "[P]ersonal jurisdiction is a defendant-specific inquiry," and instead of "simply aggregat[ing] the defendants' contacts under the general rubric of" the 2002 and 2003 Distressed Debt Strategies, we have to determine whether "each defendant, taken individually, has sufficient minimum contacts with Illinois to satisfy due process." *Richard Knorr International, Ltd. v. Geostar, Inc.*, No. 08 C 5414, 2010 WL 1325641, at *4 (N.D. Ill. Mar. 30, 2010); see also *Calder*, 465 U.S. at 790 ("Each defendant's contacts with the forum State must be assessed individually.").

¶ 113    We note that, in their complaint, plaintiffs do not specifically ask the trial court to pierce the corporate veil. See *South Side Bank v. T.S.B. Corp.*, 94 Ill. App. 3d 1006, 1010 (1981) ("One who seeks to have the courts apply an exception to the rule of separate corporate existence *** must seek that relief in his pleading and carry the burden of proving actual identity or a misuse of corporate form which, unless disregarded, will result in a fraud on him.").

¶ 114                    b. Plaintiffs' Contention That Defendants Have Waived
                         a Defendant-by-Defendant Analysis of Contacts

¶ 115    On December 21, 2009, in the trial court, defendants jointly moved for dismissal on the ground of lack of personal jurisdiction (735 ILCS 5/2-301(a) (West 2008)). They did so in a single motion. In the opening paragraph of their motion, they specially defined the term " 'Gramercy' " as meaning, "collectively," "[d]efendants Gramercy Advisors LLC ***[;] Gramercy Asset Management LLC ***[;] Gramercy Financial Services, LLC ***[;] Tall Ships Capital Management, LLC ***[;] and Jay A. Johnston." Then, further into their motion, they made such assertions as "Gramercy's contacts with Illinois fall well below the threshold required by due process" and "At no time has Gramercy advertised in the State of Illinois."

¶ 116    In February 2010, defendants filed a memorandum in support of their motion for dismissal. At the beginning of the memorandum, they specially defined " 'Gramercy' " the same way they had specially defined that term in their motion. Then, in the "Argument" section of the memorandum, they made such arguments as "Gramercy has not transacted business with Plaintiffs within Illinois" and "Gramercy has not travelled to, transacted business in, directed tortious communications to, or purposefully directed any of its activities toward Illinois in relation to Plaintiff [*sic*]."

¶ 117    Lanava structured his affidavit of December 11, 2009, the same way. He began by specially defining " 'Gramercy' " as the five defendants (listing them), and then, further into his affidavit, he made such statements as "At no time has Gramercy maintained any agents, employees[,] or other representatives in the State of Illinois" and "The services rendered by Gramercy in connection with Plaintiffs' investments were performed entirely outside of Illinois."

- 19 -

¶ 118    In a subsequent affidavit, dated July 16, 2014, Lanava used the term " 'Gramercy Entity Defendants,' " specially defining it to mean Gramercy Advisors, Gramercy Asset Management, Gramercy Financial, and Tall Ships (but not including Johnston). In that affidavit, he made such statements as "At no time have the Gramercy Entity Defendants advertised in the State of Illinois" and "To the best of my knowledge, any of the transactions executed by the Gramercy Entity Defendants in connection with the subject matter of the [c]omplaint *** were initiated from New York, New York[,] or Greenwich, Connecticut[,] and the vast majority of those transactions were cleared primarily through New York or Florida banks and financial institutions."

¶ 119    Similarly, in the introduction of their appellate brief, the five defendants specially define " 'Gramercy' " as Gramercy Advisors, Gramercy Asset Management, Gramercy Financial, and Tall Ships (not including Johnston) and " 'the Gramercy Defendants' " as those four defendants plus Johnston. Then defendants use those specially defined terms throughout their brief, saving themselves the hassle of listing their names over and over again (as they could have done by calling themselves, simply, "defendants"—but they "[refer] to [themselves] as in the trial court" (Ill. S. Ct. R. 341(f) (eff. Feb. 6, 2013)), and originally there were more defendants than the "Gramercy"-affiliated defendants).

¶ 120    Plaintiffs, however, regard these specially defined terms as more than space-saving devices; they regard them as a surrender of individual identity. In their petition for rehearing, plaintiffs argue that by choosing to use the terms "Gramercy" and "Gramercy Entity Defendants," defendants made a "strategic and tactical decision" to "argue jurisdiction under the collective 'Gramercy' group theory" and that they thereby "waived any jurisdictional arguments based on a defendant-by-defendant analysis of contacts."

¶ 121    A "waiver" is "an express or implied voluntary relinquishment of a known and existing right." *Batterman v. Consumers Illinois Water Co.*, 261 Ill. App. 3d 319, 321 (1994). To our knowledge, none of the defendants has ever expressly said: "For purposes of personal jurisdiction, I relinquish my constitutional right under *Rush*, 444 U.S. at 331-32, and comparable authorities to be regarded as a person or entity separate from my codefendants, and whatever contact any of them has made with Illinois should be regarded as my own contact" (or words to that effect). Therefore, we assume that plaintiffs intend to make a claim of implied waiver. According to *Batterman*, "[a]n implied waiver may arise from either of two situations: (1) an unexpressed intention to waive can be clearly inferred from the circumstances or (2) the conduct of one party has misled the other party into a reasonable belief that a waiver has occurred." *Batterman*, 261 Ill. App. 3d at 321.

¶ 122    Because (2) requires no intention to relinquish a right, it actually results in an estoppel, not a waiver (*Lake County Grading Co. of Libertyville, Inc. v. Advance Mechanical Contractors, Inc.*, 275 Ill. App. 3d 452, 462 (1995)), but because *Batterman* describes an implied waiver as being either (1) or (2), we will liberally interpret plaintiffs as meaning to invoke the doctrines of both waiver and estoppel.

¶ 123    We are unconvinced that defendants have waived a defendant-by-defendant analysis of personal jurisdiction or that they have lost their separate identities by estoppel. It could not "be clearly inferred," nor could plaintiffs have "reasonably belie[ved]," that, merely by using the specially defined terms "Gramercy" and "Gramercy Entity Defendants," defendants had "made a strategic and tactical decision" to relinquish their individual and corporate identities and dispense with "a defendant-by-defendant analysis of contacts." See *Batterman*, 261 Ill.

- 20 -

App. 3d at 321. Plaintiffs are piling on these terms a weight of significance they cannot possibly bear. There is no "theory" behind shorthand. Nor is there is any "strategy" behind shorthand other than minimizing the word count and saving trees.

¶ 124   Plaintiffs believe we are being unfair to them by failing to recognize a deeper significance in the terms "Gramercy" and "Gramercy Entity Defendants." They believe we are foisting a new, unexpected theory on them, a theory to which they never had a fair opportunity to respond in the trial court. They cite *Gregory v. Beazer East*, 384 Ill. App. 3d 178 (2008), in which the appellate court held that "the theory under which a case is tried in the trial court cannot be changed on review" and a "party waives [the] right to complain of error where to do so is inconsistent with [the] position taken by [the] party in [the] earlier proceeding" (internal quotation marks omitted) (*id.* at 195). We see no real change or inconsistency, however. If, in the trial court, six defendants—let us call them *A*, *B*, *C*, *D*, *E*, and *F*—refer to themselves collectively by saying, "We never made any contact with Illinois," then, by corollary, they take the position that neither *A* nor *B* nor *C* nor *D* nor *E* nor *F* has ever made contact with Illinois. Otherwise, they could not accurately say "we" never did so. That is not a new theory; that is logic. In sum, we are unconvinced that, by operation of the doctrine of waiver or estoppel, defendants relieved plaintiffs of their "burden of establishing personal jurisdiction over each defendant." *Cornell v. Kellner*, 539 F. Supp. 2d 311, 313 (D.D.C. 2008).

¶ 125   To what extent have plaintiffs carried their burden? Let us begin our defendant-by-defendant analysis with the three affiliates of Gramercy Advisors—Gramercy Asset Management, Tall Ships, and Gramercy Financial—taking them one at a time in the order that plaintiffs discuss them in their petition for rehearing.

¶ 126                          c. Gramercy Asset Management

¶ 127   Plaintiffs disagree with our conclusion that Gramercy Asset Management has made insufficient contacts with Illinois to justify the exercise of personal jurisdiction over that defendant. In their petition for rehearing, plaintiffs argue that Gramercy Asset Management made more contacts with Illinois than the defendant did in *Kalata v. Healy*, 312 Ill. App. 3d 761 (2000), a case in which the appellate court held the exercise of personal jurisdiction to be reasonable (*id.* at 769).

¶ 128   In *Kalata*, the defendant, a California resident, telephoned the plaintiff, in Illinois, and made deceptive promises to her, namely, that if the plaintiff sent the defendant $100,000, the defendant would deposit it into a joint account in a California bank and would use it to buy a residence in California, which the two of them would share and which would be the property of their joint venture. *Id.* at 763. The defendant mailed forms to the plaintiff for her to sign, telling her they "were necessary to open a joint bank account or escrow account at a California bank." *Id.* The plaintiff signed the forms and returned them to the defendant, and then the plaintiff deposited $100,000 into the resulting bank account. *Id.* Later, the plaintiff discovered that not only had the defendant withdrawn all the funds from the purported joint-venture account, but in actuality, the account was in neither the plaintiff's name nor the name of the joint venture—it was solely in the defendant's name. *Id.* After failing to persuade the defendant to reimburse her the $100,000, the plaintiff sued her in Illinois, "alleg[ing] that [the defendant had] solicited and obtained money from [her] in a scheme designed to defraud her." *Id.* at 766-67.

¶ 129    The defendant in *Kalata* made tortious misrepresentations to the plaintiff, and it was in Illinois that she made these misrepresentations. *Id.* at 764. She telephoned the plaintiff in Illinois and made promises to her while having no intention of keeping these promises. The defendant misrepresented her own intention, thereby fraudulently inducing the plaintiff to send her $100,000. See *Willis v. Atkins*, 412 Ill. 245, 260 (1952) ("[W]hile a promise to perform an act, even though accompanied by an intention not to perform, is not such a false representation as would constitute fraud, yet where the false promise or representation of future conduct is the scheme or devi[c]e used to accomplish the fraud and cheat another of his property, equity will right the wrong and restore the property [in an action for fraud]."). We do not see how Gramercy Asset Management is comparable to the defendant in *Kalata*. As we review the facts in plaintiffs' petition for rehearing, we see no tortious misrepresentation by Gramercy Asset Management to Khan in Illinois. We see no allegation that Gramercy Asset Management telephoned, wrote, or visited Khan in Illinois and told him a falsehood.

¶ 130    We see that, in May 2003 and October 2004, various contractual documents were sent to Khan, in Illinois, for him to sign—documents necessary for the implementation of the 2003 Distressed Debt Strategy—and plaintiffs say in their petition for rehearing that it was Gramercy Asset Management that sent these contractual documents to him. In Khan's affidavit, however, which plaintiffs cite, he says that "Gramercy" sent these contractual documents to him, and earlier in his affidavit, he defines " 'Gramercy' " as "Gramercy Advisors and its many affiliated entities." Therefore, even if the sending of these contractual documents amounted to bad or dishonest advice from a fiduciary to sign them, it is unclear that Gramercy Asset Management, specifically, was the sender-advisor. Rather, we note that exhibit No. 5 of Khan's affidavit is a cover letter, dated January 28, 2005, in which his executive assistant, Angie Brooks, returns the "Contribution Agreement" and "Participation Agreement" to "Gramercy" at 20 Dayton Avenue, Greenwich, Connecticut—which is the address of Gramercy Advisors.

¶ 131    It is true that Gramercy Asset Management was a party to these contracts, which Khan executed in Illinois. But Gramercy Asset Management executed them outside Illinois, and besides, even if all the parties to these contracts had executed them in Illinois, "[the] mere execution of a contract in Illinois [would] not [be] by itself a sufficient transaction of business to trigger the application of the long-arm statute." (Internal quotation marks omitted.) *Forrester v. Seven Seventeen HB St. Louis Redevelopment Corp.*, 336 Ill. App. 3d 572, 578 (2002). It must follow that Khan's execution of these contracts in Illinois does not make them "substantially connected with this State." 735 ILCS 5/2-209(a)(7) (West 2012).

¶ 132    In addition to the proposed contracts, some account statements and a Schedule K-1 were sent to Khan in Illinois. It is unclear, though, how the account statements were tortious misrepresentations. As for the 2003 Schedule K-1 for JONCTION, on which Khan relied when claiming millions of dollars in invalid losses, he says in his affidavit that Gramercy Advisors, not Gramercy Asset Management, sent that to him. Exhibit Nos. 46 and 47 of his affidavit are United States Postal Service return receipts showing that "Gramercy Advisors LLC" sent Khan the Schedule K-1 pertaining to JONCTION. Arguably, this Schedule K-1 was a damaging tortious communication made to Khan in Illinois, but it was Gramercy Advisors, rather than Gramercy Asset Management, that mailed that communication to him.

¶ 133    Granted, Gramercy Asset Management executed trades outside Illinois that contributed to, and helped make possible, the ultimate adverse effect the Khans felt in Illinois. Citing *Hoffman*

*v. Barnes*, No. 12 C 31, 2012 WL 1021837, at \*2 (N.D. Ill. Mar. 26, 2012), plaintiffs argue that Gramercy Asset Management's "contacts with Illinois are further sufficient because the effects of the fraudulent 2003 [Distressed Debt Strategy] that it controlled pursuant to the [Gramercy Asset Management investment management agreement] and other agreements were felt by Khan in Illinois." *Hoffman*, however, predates *Walden*, and the clear holding of *Walden* is that doing something outside the forum state that has a foreseeable effect on someone inside the forum state does not serve as a minimum contact with the forum state (see *Walden*, 571 U.S. at ___, 134 S. Ct. at 1125). "[T]he plaintiff cannot be the only link between the defendant and the forum." *Id.* at ___, 134 S. Ct. at 1122. Thus, we adhere to our conclusion that Gramercy Asset Management has not made minimum contacts with Illinois. In the absence of such minimum contacts, exercising personal jurisdiction over that defendant would violate due process. See *International Shoe*, 326 U.S. at 316.

¶ 134                              d. Tall Ships

¶ 135     In their petition for rehearing, plaintiffs disagree with our conclusion that Tall Ships made no minimum contacts with Illinois. They disagree for two reasons.

¶ 136     First, plaintiffs remind us that, in November 2002, to implement the 2002 Distressed Debt Strategy, "Tall Ships sent Khan (in Illinois) a number of agreements, to which Tall Ships and/or UVIADO (for which Tall Ships was the Sole Manager) were also parties." These agreements included the contribution agreement for UVIADO, three interest transfer agreements, and an assignment agreement.

¶ 137     Actually, according to exhibit Nos. 35 and 37 of Khan's affidavit, it was not Tall Ships but Daniel Menet of Gramercy Advisors who e-mailed and mailed him the contribution agreement and the three interest transfer agreements.

¶ 138     As for the assignment agreement, the record does not appear to reveal which company mailed it to Khan. The pages of the record to which plaintiffs cite in their petition for rehearing are the assignment agreement itself, which does not reveal who sent it to Khan. In any event, because the execution of a contract in Illinois is not a minimum contact with Illinois (*Forrester*, 336 Ill. App. 3d at 578), neither is the act of sending a contract to Illinois for execution.

¶ 139     The second reason why plaintiffs disagree with our finding of no minimum contacts by Tall Ships is that, on paper at least, Tall Ships had significant powers as the sole manager of UVIADO. As the sole manager, Tall Ships had the power not only to determine UVIADO's investments, including its investments in distressed debt, but also to determine the amount and "allocation of Net Profit, Net Loss, and items of taxable income, gains, losses, and deductions among the Members," to quote the "UVIADO LLC Amended and Restated Operating Agreement" of November 18, 2002. Further, under this agreement, each member, including Khan, "agree[d] not to treat, on his personal U.S. Federal income tax return or in any claim for a refund, any item of income, gain, loss, deduction[,] or credit in a manner inconsistent with the treatment of such item by the Company." Plaintiffs remind us that it was UVIADO's tax return and corresponding Schedule K-1 that served as "the mechanism \*\*\* direct[ing] [p]laintiffs"—disastrously—"to claim millions of dollars in losses on their tax returns." UVIADO's 2002 Schedule K-1 "was mailed to Plaintiffs in Illinois," and Khan used it to claim the invalid tax losses.

¶ 140    Actually, Khan says in his affidavit that it was not Tall Ships, specifically, but "Gramercy" that sent him the 2002 UVIADO Schedule K-1. And although Tall Ships was designated as the tax matters partner in the 2002 UVIADO tax return, it was not Tall Ships but Gramercy Advisors that provided the Tennessee accounting firm, Financial Strategy Group, the "summary data sheets" to be used in preparing the 2002 UVIADO tax return and associated Schedules K-1. To the extent that Tall Ships participated at all in the preparation of UVIADO's tax return—and we have no information that it actually did—we are unaware of any evidence that Tall Ships did so in Illinois. If, in Connecticut, where it is headquartered, Tall Ships made a decision on the allocation of tax losses for members of UVIADO, Khan ultimately did feel the effect in Illinois, the same way (reverting to *Walden*) the professional gamblers felt the effect in Nevada when the DEA agent seized and held onto their cash in Georgia, but Tall Ships would not have thereby made contact with Illinois any more than the DEA agent thereby made contact with Nevada. Therefore, we adhere to our finding of no minimum contacts by Tall Ships.

¶ 141                              e. Gramercy Financial

¶ 142    All Gramercy Financial did was (1) sell options to Khan and (2) exchange its own receivables for LEMAN's receivables. We are aware of no evidence that either of these transactions happened in Illinois (Khan bought the options through his attorney-in-fact, Gramercy Advisors). These transactions affected Khan in Illinois, as the 2003 Distressed Debt Strategy contemplated they would do—but, again, an effect felt in Illinois without any contacts by the defendant with Illinois does not justify the exercise of personal jurisdiction in Illinois (see *Walden*, 571 U.S. at ___, 134 S. Ct. at 1125). Absent minimum contacts by Gramercy Financial with Illinois, exercising personal jurisdiction over Gramercy Financial would violate due process. See *International Shoe*, 326 U.S. at 316.

¶ 143    In their petition for rehearing, plaintiffs argue that "[Gramercy Financial's] contacts with Illinois are sufficient for personal jurisdiction because [Gramercy Financial] purposely directed its activities at Khan, an Illinois resident, and because it or its Gramercy affiliates purposely derived benefits from its interstate activities." In support of that argument, they cite *Kalata*, 312 Ill. App. 3d at 769, and *Aasonn*, 2011 IL App (2d) 101125, ¶¶ 14-21.

¶ 144    *Kalata* is distinguishable because, in that case, the California defendant "purposefully directed" her activities at Illinois by making tortious misrepresentations to the plaintiff, in Illinois. *Kalata*, 312 Ill. App. 3d at 769. When the defendant mailed bank documents to the plaintiff, she received those documents and signed them in the context of the defendant's false representations to her (by telephone calls to her, in Illinois) that the resulting bank account would be a joint account and that the $100,000 that the plaintiff would deposit into that account would be applied toward the purchase of real estate that she and the defendant would own together. See *id.* at 763. In the present case, by contrast, we are aware of no evidence that Gramercy Financial made tortious misrepresentations to plaintiffs, in Illinois. We make the same observation regarding Gramercy Financial that we made regarding Gramercy Asset Management: we are aware of no evidence or allegation that Gramercy Financial telephoned, wrote, or visited Khan in Illinois and made a fraudulent representation to him.

¶ 145    As for the other case that plaintiffs cite, *Aasonn*, the appellate court in that case used a three-factor test to decide whether the defendant in a contractual relationship had purposefully availed itself of the protections and benefits of Illinois law: (1) who initiated the transaction,

(2) where the contract was entered into, and (3) where performance was to occur. *Aasonn*, 2011 IL App (2d) 101125, ¶ 16. There also is a fourth factor, according to *Viktron Ltd. Partnership v. Program Data Inc.*, 326 Ill. App. 3d 111, 117-18 (2001): where the contract was negotiated. More recently, however, the appellate court has held that, although those four factors might control a *statutory* long-arm analysis, when it comes to a *constitutional* due process analysis, "focusing our minimum contacts analysis to these—and only these—factors would run afoul of the United States Supreme Court's rejection of 'mechanical tests' for personal jurisdiction in favor of a 'highly realistic' approach." *Madison Miracle Productions, LLC v. MGM Distribution Co.*, 2012 IL App (1st) 112334, ¶ 62 (quoting *Burger King*, 471 U.S. at 478-79). And recall that the addition of subsection (c), the catchall provision, to section 2-209 reduces the jurisdictional analysis to "the single issue of whether a defendant's contacts are sufficient to satisfy federal and Illinois due process." *Russell*, 2013 IL 113909, ¶ 30; see also *Hope Clinic*, 2013 IL 112673, ¶ 47 (interpretation of the Illinois due process clause in "limited lockstep" with the federal due process clause).

¶ 146    This is not to deny the continuing relevance of the four factors to constitutional due process analysis, but under *Burger King*, "our analysis will also consider the terms of the relevant contracts, the contemplated future consequences of those agreements, and the parties' actual course of dealing." *Madison*, 2012 IL App (1st) 112334, ¶ 62. In this connection, the *Madison* court quoted *Burger King*:

> " '[The Supreme Court long] ago rejected the notion that personal jurisdiction might turn on "mechanical" tests, [citation], or on "conceptualistic ... theories of the place of contracting or of performance," [citation]. Instead, [it has] emphasized the need for a "highly realistic" approach that recognizes that a "contract" is "ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction." [Citation.] It is these factors—prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing—that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum.' " *Id.* ¶ 54 (quoting *Burger King*, 471 U.S. at 478-79).

¶ 147    The contract in *Burger King* was a franchise agreement between a Michigan franchisee, John Rudzewicz (*Burger King*, 471 U.S. at 466), and a Florida franchisor, Burger King Corporation (*id.* at 464). Rudzewicz had "deliberately reached out beyond Michigan and negotiated with [the] Florida corporation for the purchase of a long-term franchise." (Internal quotation marks omitted.) *Id.* at 479-80. Because the resulting franchise agreement had a term of 20 years and because of the "manifold benefits" that Rudzewicz would derive from Burger King—and, by the same token, the "exacting regulation" he had agreed to accept from Burger King's Miami headquarters—during this 20-year contractual term, the franchise agreement had a "*substantial* connection" with Florida. (Emphasis in original and internal quotation marks omitted.) *Id.* at 479. "[T]he quality and nature of his relationship to the company in Florida [could] in no sense be viewed as random, fortuitous, or attenuated." (Internal quotation marks omitted.) *Id.* at 480. By refusing to make the contractually required franchise payments to Burger King in Florida and by continuing to use Burger King's trademarks and confidential business information even after Burger King notified him the franchise was terminated for cause, Rudzewicz foreseeably caused injuries to Burger King, in Florida. *Id.* Thus, "it was, at the least, presumptively reasonable for [him] to be called to account there for such injuries." *Id.*

¶ 148    It was perhaps foreseeable that Gramercy Financial, Tall Ships, and Gramercy Asset Management could cause injury to Khan in Illinois by implementing "investment strategies" that had no economic substance, that had no apparent point other than dodging taxes. But "the foreseeability of causing injury in another State," though relevant, "is not a sufficient benchmark for exercising personal jurisdiction." (Emphasis and internal quotation marks omitted.) *Id.* at 474. It was foreseeable that the DEA agent in *Walden* could cause injury to the respondents in Nevada by seizing their gambling proceeds in Georgia, yet personal jurisdiction over him in Nevada was constitutionally impermissible. Rudzewicz foreseeably injured Burger King in Florida—but that was not all. The franchise agreement he had negotiated with Burger King had a substantial connection with Florida: the agreement contemplated a long, 20-year relationship in which Rudzewicz would reap continuing benefits from Burger King and Burger King would make extensive, continuing demands on him from its Miami headquarters. *Id.* at 479-80.

¶ 149    By comparison, Khan's relationship with Gramercy Financial, Tall Ships, and Gramercy Asset Management was transient and attenuated. The "quality and nature of his relationship" with them provide scant justification for the exercise of personal jurisdiction in Illinois. (Internal quotation marks omitted.) *Id.* at 480. With each of these three defendants, over a relatively short period of time, he executed a series of transactions necessary to set the stage for the Schedule K-1—and then his relationship with them was over. These three defendants performed their brief roles as third-party implementers, and then they promptly exited the stage. We disagree that Khan's agreements with them had "a substantial connection" with Illinois, and therefore, we deny plaintiffs' petition for rehearing. (Emphasis and internal quotation marks omitted.) *Id.* at 479.

¶ 150    F. How Gramercy Advisors and Johnston Differ From the Three Affiliates:
They Purposefully Reached Out and Made Minimum Contacts With Illinois
Instead of Merely Causing an Effect Here

¶ 151    Unlike the three affiliates we just finished discussing, Gramercy Advisors and Johnston made contact with this state. We are unconvinced by their comparison of themselves to the DEA agent in *Walden*, who never, in any way, reached out beyond the borders of Georgia. It is not that Gramercy Advisors and Johnston engaged in a course of conduct that was hermetically sealed in Connecticut or some other nonforum state, the effect of which the Khans just happened to feel in Illinois because of the fortuitous fact that they resided here. Gramercy Advisors and Johnston purposefully reached out to Illinois.

¶ 152    How did they do so? The most obvious way is that BDO, per the agreement between Shanbrom and Johnston, served as an "advertiser," so to speak, for Gramercy Advisors in Illinois. In effect, Gramercy Advisors solicited business in Illinois through BDO. Also, Johnston made tortious misrepresentations to Khan, in Illinois, that the 2002 and 2003 Distressed Debt Strategies had economic substance (taking the complaint and Khan's affidavit to be true).

¶ 153    Let us discuss those minimum contacts one at a time.

¶ 154            1. *The Agreement Between BDO and Gramercy Advisors*
*To Jointly Promote and Implement*
*"Tax-Advantaged Strategies"*

¶ 155            a. Defendants' Claim of Forfeiture

¶ 156      Defendants complain that, "[o]n April 23, 2015, more than five months after briefing on Gramercy's Motion to Dismiss for Lack of Personal Jurisdiction closed," plaintiffs submitted documentary evidence "that BDO and Gramercy were engaged in a joint venture." The evidence, specifically, was Shanbrom's affidavit of April 21, 2015, and Jones's e-mail of January 22, 2001. Defendants assert that this " 'new' evidence is cumulative and waived" (by which they evidently mean "forfeited" (see *Pinske v. Allstate Property & Casualty Insurance Co.*, 2015 IL App (1st) 150537, ¶ 18 (explaining the difference between waiver and forfeiture)).

¶ 157      Defendants do not cite the pages of the record where the briefing schedule may be found, but we note that, in a docket entry for November 12, 2014, the trial court extended the deadline for the reply brief to November 17, 2014. Because the reply brief typically is the final brief to be filed, we infer that briefing closed on November 17, 2014—and April 23, 2015, would indeed have been, as defendants say, "more than five months after" that date.

¶ 158      On April 23, 2015, plaintiffs filed a document entitled "Plaintiffs' Motion For Leave To Supplement Their Responses in Opposition to Gramercy's Motions To Dismiss For Lack of Personal Jurisdiction." In that motion, plaintiffs told the trial court they still were reviewing more than 800,000 pages of documents produced to them in November 2014 by a former defendant in this case, Morgan, Lewis & Bockius, LLP (Morgan), and that, among those documents, they had found the e-mail of January 22, 2001, from Jones approving a bonus of $100,000 for Shanbrom in recognition of "his achievement in re-negotiating the joint venture between Gramercy and Tax Solutions." Also, they had found an e-mail of December 12, 2001, from Johnston to Jones, billing BDO $250,000 as "Gramercy's" share of the fee for "Shahid Khan" in connection with the 2001 Foreign Currency Derivative Strategy. Finally, according to this motion, plaintiffs' counsel had been conducting discovery in a case against BDO in Arkansas, and on February 5, 2015, in that case, BDO produced the handwritten note by Shanbrom, in which he memorialized the fee-splitting agreement with Johnston.

¶ 159      On the basis of this additional evidence, plaintiffs invoked the joint-venture theory of personal jurisdiction, under which "the minimum contacts of one co-venturer" (in this case, BDO) "[were] attributable to other co-venturers" ("Gramercy") "such that personal jurisdiction over one [meant] personal jurisdiction over all." *Hill v. Shell Oil Co.*, 149 F. Supp. 2d 416, 418 (N.D. Ill. 2001).

¶ 160      On May 1, 2015, in response to this motion by plaintiffs, defendants sent a letter to the trial court in which they requested the entry of an order that would have done the following (we quote from defendants' letter): "(i) require Plaintiffs to provide Gramercy with the [Morgan] document production referenced in their motion; and (ii) grant Gramercy 90 days to review the nearly 800,000 pages of documents therein, and an additional 30 days to respond to Plaintiffs' motion (without prejudice to Gramercy's right to request additional time)." Noting that plaintiffs had previously refused to turn over to them these 800,000 pages of documents, defendants argued: "Without such relief, Gramercy will undoubtedly be prejudiced by Plaintiffs' motion, which references documents withheld from Gramercy in violation of the

law, and raises new arguments against Gramercy's motion to dismiss to which it is entitled to respond with the benefit of the same discovery materials available to Plaintiffs."

¶ 161    It does not appear that the trial court ever ruled on this motion to compel production. Instead, on May 15, 2015, the trial court denied defendants' motion for dismissal. In its order, the court remarked: "In the Gramercy matter, after time for briefing had expired[,] counsel has sent the Court letters and emails regarding trial court decisions across the country and most recently, beginning April 23, 2015[,] correspondence regarding Plaintiffs' Request for Leave to Supplement Responses to Defendants' motions. The Court felt obligated to at least review all of this documentation, none of which will be relied on for this order."

¶ 162    Now that we are clear what happened in the trial court, we are in a position to observe that, in their letter to the court, defendants did not take the position they take now, that plaintiffs should be barred from presenting the additional documentary evidence because they failed to present it within the time limits of the briefing schedule. Instead, defendants sought to compel plaintiffs to turn over the documents they had obtained from Morgan, and defendants sought additional time to review those documents once plaintiffs turned them over. Thus, in the proceedings below, the ground for defendants' objection was not a violation of the briefing schedule but, rather, the withholding of the documents that Morgan had produced to plaintiffs. And the remedy defendants requested was not plaintiffs' forfeiture of the additional evidence but, rather, the production of the documents from Morgan and time to review them. Instead of claiming forfeiture in the trial court, defendants moved to compel discovery. They cannot request, for the first time on appeal, a remedy they never requested below. See *Feeley v. Michigan Avenue National Bank*, 141 Ill. App. 3d 187, 188 (1986); *Bell v. Yale Development Co.*, 102 Ill. App. 3d 108, 112 (1981). We could not reasonably blame the trial court for omitting to declare a forfeiture that defendants never sought.

¶ 163    Setting aside the problem that defendants are requesting a new remedy, they cite no authority for this new remedy: they cite no case holding that the expiration of a briefing schedule precludes the presentation of additional documentary evidence. See Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013) ("Argument, *** with citation of the authorities *** relied on."). As a matter of English, a "briefing schedule" applies to briefs, not evidence. We are aware of no decision holding otherwise.

¶ 164    The only authority that defendants offer in support of their claim of forfeiture is a decision by the circuit court of Cook County in Kaufman v. BDO Seidman, LLP, No. 12-L-13292 (Cook Co. Cir. Ct.), a copy of which they have attached as an appendix to their reply brief. First, decisions of a circuit court have no precedential value (*Delgado v. Board of Election Commissioners*, 224 Ill. 2d 481, 488 (2007))—and the same goes for Coe v. BDO Seidman, LLP, No. 12-L-013691 (Cook Co. Cir. Ct.), another circuit court case that defendants cite in their brief. Second, even if the circuit court's decision in Kaufman v. BDO Seidman, LLP, had any precedential value, the decision is inapposite: when refusing to consider Shanbrom's affidavit regarding the "joint venture," the circuit court in that case was ruling on a petition for relief from judgment (735 ILCS 5/2-1401 (West 2014)), which required a showing that, in the exercise of due diligence, the plaintiff could not have presented Shanbrom's affidavit before the entry of the judgment. But plaintiffs in this case filed no section 2-1401 petition. They did not seek to vacate a judgment that was more than 30 days old. Rather, they submitted their additional evidence *before* the trial court made its decision.

¶ 165     When reviewing the record *de novo* (see *McNally v. Morrison*, 408 Ill. App. 3d 248, 254 (2011)), we do not see how defendants suffered any prejudice from the additional evidence, considering that, as they themselves claim, the additional evidence was merely "cumulative" and considering that defendants had ample time to file a counteraffidavit if they had seen fit to do so. Plaintiffs filed the additional evidence on April 23, 2015, and the trial court made its decision on May 15, 2015. Thus, if Shanbrom was inaccurate in his recollection of the deal he had struck with Johnston, Gramercy Advisors had three weeks to obtain an affidavit to that effect from Johnston. No such counteraffidavit was forthcoming.

¶ 166     It is unclear why defendants would have needed to review the 800,000 pages of documents from Morgan to determine (1) the terms of the oral agreement that Johnston had reached with Shanbrom and (2) the amount that BDO had paid to Gramercy Advisors as its share of Khan's fee. In sum, we see no reason to disregard evidence of the fee-sharing agreement between BDO and Gramercy Advisors, an agreement that defendants apparently do not dispute.

¶ 167     It is true that, after reviewing the additional evidence, the trial court chose not to rely on it as a basis for its ruling. But "this court reviews the determination of the trial court, not its reasoning, and therefore we may affirm on any basis in the record[,] [regardless of] whether *** the trial court relied on that basis or its reasoning was correct." *Antonacci v. Seyfarth Shaw, LLP*, 2015 IL App (1st) 142372, ¶ 21. (We hasten to add that we imply no criticism of the trial court. We can see that Judge Ford has labored heroically in these complicated cases, and we commend him for his work.)

¶ 168                    b. How Gramercy Advisors Purposefully Availed Itself,
              Through BDO, of the Privilege of Conducting Activities in Illinois

¶ 169     In federal case law, there is such a thing as the joint-venture theory of personal jurisdiction, whereby the actions of one coventurer in the forum state are automatically imputed to another coventurer (*Gross v. GGNSC Southaven, LLC*, No. 3:14CV00037-M-A, 2014 WL 4418051, at *3 (N.D. Miss. Sept. 8, 2014); *Wendt v. Handler, Thayer & Duggan, LLC*, 613 F. Supp. 2d 1021, 1030 (N.D. Ill. 2009)), but defendants dispute that the relationship of Gramercy Advisors with BDO met all the elements of a joint venture as defined by Illinois case law.

¶ 170     We are leery of using a checklist of common-law elements to decide whether the exercise of personal jurisdiction comports with constitutional due process. That, basically, is what the joint-venture theory of jurisdiction would do. Such an approach seems too mechanical. See *Burger King Corp.*, 471 U.S. at 478-79 (personal jurisdiction does not turn on "mechanical tests"). Even if, technically, the relationship of Gramercy Advisors with BDO "[fell] slightly outside the confines" of a "joint venture" as defined by Illinois law, "the question before us is whether a sufficient relationship exist[ed] under the Due Process Clause to permit the exercise of jurisdiction, not whether a partnership, joint venture, or other particular agency relationship between [them] exist[ed]." *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 56-57 (1st Cir. 2002).

¶ 171     Two parties can have a business relationship or contractual understanding that contemplates one party's acting for the benefit of them both in the forum state. A nondomiciliary can take advantage of legal rights and protections in the forum state by arranging for a domiciliary to act there on his behalf or for his benefit. *Burger King*, 471 U.S. at 479 n.22. "[I]t is essential in each case that there be some act by which the defendant purposefully avail[ed] himself of the privilege of conducting activities within the forum State,

thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). This purposeful availment need not be direct; it can be through someone else, as long as this someone else makes contact with the forum state bilaterally rather than unilaterally. See *Burger King*, 471 U.S. at 479 n.22 ("We have previously noted that when commercial activities are carried on in behalf of an out-of-state party[,] those activities may sometimes be ascribed to the party [citation], at least where he is a primary participant in the enterprise and has acted purposefully in directing those activities [citation]." (Internal quotation marks omitted.)); *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984) ("[The] *unilateral* activity of another party or a third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction." (Emphasis added.)); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295 (1980) ("Petitioners carry on no activity whatsoever in Oklahoma. They close no sales and perform no services there. They avail themselves of none of the privileges and benefits of Oklahoma law. *They solicit no business there[,] either through salespersons or through advertising reasonably calculated to reach the State.* Nor does the record show that they regularly sell cars at wholesale or retail to Oklahoma customers or residents or that they *indirectly, through others,* serve or seek to serve the Oklahoma market." (Emphases added.)); *Itel Containers International Corp. v. Atlanttrafik Express Service, Ltd.*, 116 F.R.D. 477, 480 (S.D.N.Y. 1987).

¶ 172    In the plurality decision of *Asahi Metal Industry Co. v. Superior Court*, 480 U.S. 102 (1987), Justice O'Connor set forth various business relationships between a resident and nonresident by which the nonresident could purposefully make minimum contacts with the forum state. *Id.* at 112 (opinion of O'Connor, J., joined by Rehnquist, C.J., and Powell and Scalia, JJ.). But first, let us recount the facts of *Asahi*.

¶ 173    Gary Zurcher lost control of his motorcycle and crashed when the tube in the rear tire of his motorcycle blew out. *Id.* at 106 (majority opinion). He filed a product-liability action in California, where the accident occurred, naming, among others, Cheng Shin Rubber Industrial Co., Ltd. (Cheng Shin), the Taiwanese manufacturer of the tube. *Id.* at 105-06. Cheng Shin in turn brought an action for indemnification against the manufacturer of the tube's valve assembly, a Japanese corporation, Asahi Metal Industry Co., Ltd. (Asahi). *Id.* at 106. Asahi moved to quash Cheng Shin's service of summons, arguing that the due process clause of the fourteenth amendment (U.S. Const., amend. XIV) forbade California to exercise personal jurisdiction over Asahi. *Asahi*, 480 U.S. at 106.

¶ 174    The Supreme Court agreed that "the exercise of personal jurisdiction by a California court over Asahi in this instance would be unreasonable and unfair" and, hence, a violation of due process. *Id.* at 116 (opinion of O'Connor, J., joined by Rehnquist, C.J., and Brennan, White, Marshall, Blackmun, Powell, and Stevens, JJ.). Due process required not only minimum contacts but also fair play and substantial justice. *Burger King*, 471 U.S. at 476. Haling a Japanese corporation, Asahi, into a California court would have been, in the circumstances of this case, unjust.

¶ 175    The Supreme Court was divided, though, on whether the mere act of placing a product in the stream of commerce, with the expectation that it would be purchased in the forum state, qualified as a *minimum contact* with the forum state for purposes of *International Shoe*. Justice Brennan thought it did, and Justices White, Marshall, and Blackmun agreed with him. *Asahi*,

480 U.S. at 121 (Brennan, J., concurring in part and concurring in the judgment, joined by White, Marshall, and Blackmun, JJ.).

¶ 176 Justice O'Connor thought, however, that, to make minimum contact with the forum state, the nonresident defendant had to do something "more purposefully directed at the forum State than the mere act of placing a product in the stream of commerce," and Chief Justice Rehnquist and Justices Powell and Scalia agreed with her. *Id.* at 110 (opinion of O'Connor, J., joined by Rehnquist, C.J., and Powell and Scalia, JJ.). Justice O'Connor wrote:

> "The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State. Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State." *Id.* at 112.

Asahi, Justice O'Connor observed, did no business in California; nor did it have any agents or property there. *Id.* Nor did Asahi "advertise or otherwise solicit business in California." *Id.*

¶ 177 Thus, in *Asahi*, there are two competing standards: the broad stream-of-commerce standard and the narrow stream-of-commerce standard. Under the broad stream-of-commerce standard, championed by Justice Brennan, the exercise of personal jurisdiction comports with due process if the defendant was aware that the product was being marketed in the forum state. See *Russell*, 2013 IL 113909, ¶ 68. But under the narrow stream-of-commerce standard, championed by Justice O'Connor, such awareness is not enough: the defendant must do something more, such as advertising in the forum state, marketing the product in the forum state through a distributor, or establishing channels for regularly providing advice to customers in the forum state. See *id.* ¶ 47. (Subsequently, in *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873 (2011), another plurality decision, a majority of the Supreme Court did not come down clearly in favor of either the broad or the narrow stream-of-commerce standard in *Asahi*. *Russell*, 2013 IL 113909, ¶¶ 59, 70.)

¶ 178 We conclude, in our *de novo* review (*Innovative Garage Door Co. v. High Ranking Domains, LLC*, 2012 IL App (2d) 120117, ¶ 11), that, as to Johnston and Gramercy Advisors, the undisputed facts in this case satisfy Justice O'Connor's narrow stream-of-commerce standard. *Ipso facto*, they satisfy Justice Brennan's broad stream-of-commerce standard. *Russell*, 2013 IL 113909, ¶ 78.

¶ 179 For one thing, Johnston, on behalf of Gramercy Advisors, entered into an agreement with BDO, an Illinois partnership, to jointly promote "investment strategies," such as the 2002 and 2003 Distressed Debt Strategies. Merely "[b]y engaging a business entity located in Illinois, [these] defendant[s] undoubtedly benefitted from Illinois'[s] system of laws, infrastructure, and business climate." *Id.* ¶ 81; see *Burger King*, 471 U.S. at 475 (explaining that, for specific jurisdiction, " 'it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws' " (quoting *Hanson*, 357 U.S. at 253)). Because BDO was headquartered in Chicago, it would have been reasonable to suppose that many of BDO's clients resided in Illinois. The fee-sharing agreement between BDO and Gramercy Advisors enabled Gramercy Advisors to tap into BDO's client base in Illinois—a client base established by virtue of the benefits and protections of Illinois law.

¶ 180    Second—a related point—Gramercy Advisors, through Johnston, engaged BDO to act as a recommender and endorser of Gramercy Advisors, and the target audience was BDO's wealthy accounting clients. Under the agreement between BDO and Gramercy Advisors, BDO, in return for a share of the client's fee, was to refer the client to Gramercy Advisors for the investment and transactional aspects of the tax shelter. See *Asahi*, 480 U.S. at 112 (opinion of O'Connor, J., joined by Rehnquist, C.J., and Powell and Scalia, JJ.) (the something "more"—the "act[s] of the defendant purposefully directed toward the forum State"—may include "advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State"). Because BDO was headquartered in Chicago, Johnston and Gramercy Advisors no doubt expected and intended that many of the accounting clients whom BDO referred to Gramercy Advisors would be Illinois residents. Thus, through BDO, these defendants "solicit[ed] business in" Illinois. *Id.*

¶ 181    It is true that "the *unilateral* activity of *** a third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction", but BDO did not approach the Khans unilaterally; rather, BDO approached them pursuant to its agreement with Gramercy Advisors. (Emphasis added.) *Helicopteros*, 466 U.S. at 417. Through BDO, which is an Illinois partnership, Gramercy Advisors and its comanaging member, Johnston, "purposefully reach[ed] out beyond [their] State and into" Illinois, "deliberately exploit[ing] a market in" Illinois, namely, BDO's accounting clients in Illinois. (Internal quotation marks omitted.) *Walden*, 571 U.S. at ___, 134 S. Ct. at 1122. In the case of Khan alone, this exploitation of the Illinois market involved multiple tax-avoidance schemes over several years and his payment of hundreds of thousands of dollars in fees to BDO and Gramercy Advisors. Therefore, these defendants' contacts with Illinois could not be accurately characterized as "random, fortuitous, or attenuated." (Internal quotation marks omitted.) *Burger King*, 471 U.S. at 475.

¶ 182    Far from it. Not only did Gramercy Advisors have a fee-sharing agreement with BDO, under which BDO was to steer Illinois clients, such as the Khans, in its direction, but once BDO did the steering, Gramercy Advisors was to establish a fiduciary relationship with these clients and give them "regular advice" on how to accomplish the various transactional steps of the tax shelters. *Asahi*, 480 U.S. at 112 (opinion of O'Connor, J., joined by Rehnquist, C.J., and Powell and Scalia, JJ.). The multiple "investment strategies" over several years speak to the extent of the relationship, and the fiduciary role speaks to the quality of the relationship.

¶ 183    Despite these contacts, Johnston and Gramercy Advisors dispute that they purposefully made requisite minimum contacts with Illinois through BDO. To hold that they did so, they argue, would be inconsistent with our decision in *Estate of Isringhausen v. Prime Contractors & Associates, Inc.*, 378 Ill. App. 3d 1059 (2008).

¶ 184    It is true that *Isringhausen*, like the present case, involved a go-between. In *Isringhausen*, though, it is unclear that when the go-between reached out to Illinois, he did so at the behest of the Florida defendant. The go-between in *Isringhausen* was Dan Wilmath, who wore two hats, so to speak: he was an employee of the defendant, APM Custom Homes (APM), a Florida corporation, and at the same time, he was the Florida realtor of Lee Isringhausen, an Illinois resident. *Id.* at 1060-61. In his capacity as a realtor, Wilmath assisted Isringhausen with buying property in Marco Island, Florida. *Id.* at 1061. He also assisted Isringhausen with developing the property once Isringhausen bought it. "Wilmath put Isringhausen in contact with APM"

(*id.*), and then Isringhausen hired APM to build a house on Marco Island (*id.*), and then Isringhausen died (*id.* at 1062), and then the executor of his estate sued APM, in Illinois, for breach of contract (*id.*). In affirming the dismissal of the case for lack of personal jurisdiction (*id.* at 1068), we acknowledged that "Isringhausen [had been] put into contact with APM through a third party, Dan Wilmath" (*id.* at 1067), but we concluded this was not a minimum contact of APM with Illinois (*id.* at 1068). Judging from the facts recounted in the decision, there was no evidence that soliciting clients in Illinois had been part of Wilmath's job description or that he and his employer, APM, had agreed that he should reach out to Illinois on APM's behalf. In other words, the record contained no evidence that APM had purposefully reached out to Illinois through Wilmath.

¶ 185    By contrast, in the present case, BDO and Gramercy Advisors had an explicit contractual understanding that BDO would solicit its clients to approach Gramercy Advisors—including, necessarily, BDO's Illinois clients. We said in *Isringhausen*: "Illinois would have a strong interest in adjudicating a dispute where an Illinois resident was specifically targeted and allegedly victimized, as compared to the situation in our case where APM did not seek out and target Isringhausen." *Id.*

¶ 186    Gramercy Advisors seems to want to create the impression that it was minding its own business in Connecticut when, out of the blue, prompted by nothing more than professional esteem, BDO picked up the phone and referred Khan. Gramercy Advisors presents itself as an unconnected, innocent bystander who was passively acted upon, in Connecticut, by BDO and Khan. Shanbrom's affidavit tells a different story. BDO and Gramercy Advisors, in tandem, targeted Khan in Illinois, and they did so repeatedly. See *id*. As for Johnston, he was the person through whom Gramercy Advisors acted (we have explained why the fiduciary shield doctrine does not apply to him).

¶ 187                    c. The Conspiracy Theory of Personal Jurisdiction

¶ 188    As defendants understand the complaint, plaintiffs accuse them of being in a civil conspiracy with BDO to sell and implement illegal tax shelters. Defendants argue that by exercising personal jurisdiction over them on the basis of what their alleged coconspirator BDO did in Illinois, we would resort to the conspiracy theory of jurisdiction, the constitutional validity of which we called into question in *Ploense v. Electrolux Home Products, Inc.*, 377 Ill. App. 3d 1091, 1106 (2007).

¶ 189    We disagree that we thereby would fall afoul of *Ploense*. As we explained in *Ploense*, the problem with the conspiracy theory of jurisdiction is that it "would allow the exercise of personal jurisdiction over a nonresident defendant who had no minimum contacts with the forum state." *Id.* For example, *A* and *B* could enter into a civil conspiracy in Indiana, and then *B*, unilaterally and without *A*'s knowledge, could go to Texas and commit a wrongful act there in furtherance of the conspiracy. If the conspiracy theory of jurisdiction were constitutionally valid, *B*'s contacts with Texas would be automatically attributed to *A*—even if *A* never intended, never wanted, and never expected *B* to go to Texas and do anything in that state. See *id*. Attributing *B*'s Texas contacts to *A* simply because they had entered into a conspiracy in Indiana, without their having reached any agreement or having had any discussion regarding Texas, would dispense with the constitutional requirement that *A* purposefully make minimum contacts with Texas before that state exercised personal jurisdiction over him. See *Knaus v. Guidry*, 389 Ill. App. 3d 804, 824 (2009).

¶ 190    Defendants seem to reason as follows: the conspiracy theory of jurisdiction is constitutionally unsound; *ergo*, a conspirator *cannot ever* have minimum contacts with Illinois through a coconspirator. That is a *non sequitur*. As we have discussed, minimum contacts do not have to be direct. A person can purposefully make minimum contacts with the forum state through someone else. See *Asahi*, 480 U.S. at 112 (opinion of O'Connor, J., joined by Rehnquist, C.J., and Powell and Scalia, JJ.) ("advertising in the forum State *** or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State"); *Spinozzi v. ITT Sheraton Corp.*, No. 93 C 0885, 1994 WL 559110, at *5 (N.D. Ill. Oct. 6, 1994) ("The solicitation of business in Illinois is obviously completed with the intent of convincing Illinois consumers to purchase the advertised product. When ITT Sheraton caused the brochure advertising International's Acapulco Resort to appear in Illinois, it intended Illinois consumers, like the Plaintiffs, to make reservations at that resort. Therefore, International, the beneficiary of the marketing performed by ITT Sheraton, should have anticipated being haled into an Illinois court.").

¶ 191    Again, by agreement between BDO and Gramercy Advisors, BDO acted as an advertiser or conduit for Gramercy Advisors. Coconspirators or not, Gramercy Advisors purposefully solicited business in Illinois through BDO. See *Asahi*, 480 U.S. at 112 (opinion of O'Connor, J., joined by Rehnquist, C.J., and Powell and Scalia, JJ.). Gramercy Advisors must have known and expected that much of this advertising would be done in Illinois, since BDO was headquartered in Chicago and inevitably had accounting clients in Illinois. Pursuant to the fee-sharing agreement negotiated by Shanbrom and Johnston, BDO referred Khan, in Illinois, to Gramercy Advisors for the investment and transactional services necessary to the distressed debt strategies. Therefore, Gramercy Advisors, the beneficiary of such marketing performed by BDO in Illinois, reasonably should have anticipated being haled into an Illinois court if the distressed debt strategies caused harm to the Khans, whom BDO (through Shanbrom) and Gramercy (through Johnston) jointly targeted and plied with misrepresentations in Illinois, assuming the complaint and affidavits to be true. See *World-Wide Volkswagen*, 444 U.S. at 297; *Spinozzi*, 1994 WL 559110, at *5.

¶ 192    2. *A Tort Purposefully Directed at the Khans, in Illinois*

¶ 193    "A State generally has a manifest interest in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors." (Internal quotation marks omitted.) *Burger King*, 471 U.S. at 473. One such injury is a resident's detrimental reliance on a misrepresentation that a nonresident, from outside the forum state, purposefully directed at the resident within the forum state, with the intention that the resident rely on the misrepresentation. See *Rose v. Franchetti*, 713 F. Supp. 1203, 1213 (N.D. Ill. 1989).

¶ 194    Defendants argue that "the transmission of communications and money to and from the State, even if done frequently and over an extended period of time, are insufficient to meet the federal due process requirement for specific jurisdiction," and they provide approximately three pages of citations for that sweeping proposition. See Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013) ("Citation of numerous authorities in support of the same point is not favored."). If, as defendants argue, a telephone call to the forum state and a resulting transmission of money out of the forum state could never justify the exercise of personal jurisdiction in the forum state, a fraudster in Oregon, posing as the representative of an investment firm, could telephone someone in Vermont and induce him to send his life savings, and when the victim figured out

he had been duped, he could not sue the fraudster in Vermont but would have to sue him in Oregon. That is not a plausible account of the law. *Triad Capital Management, LLC v. Private Equity Capital Corp.*, No. 07 C 3641, 2008 WL 4104357, at *5 (N.D. Ill. Aug. 25, 2008) ("[E]ven when contact takes place only via telephone or email, it can create a substantial connection between the defendant and the forum state ***.").

¶ 195    None of the numerous cases that defendants cite appear to involve a tortious misrepresentation, at least as the subject of the action—not even *Marathon Oil Co. v. A.G. Ruhrgas*, 182 F.3d 291 (5th Cir. 1999). The parenthetical summary that defendants provide for that case is: "no specific jurisdiction where plaintiff alleged that '[defendant] effectuated fraud by conducting three meetings in Houston, Texas[,] and sending a great deal of correspondence to [plaintiff]' in its home state of Texas." But, significantly, the court in *Marathon* said: "[The] mere presence [of Ruhrgas] at the three meetings in Houston, together with the noted correspondence and phone calls, is not sufficient to establish the requisite minimum contacts *because the record is devoid of evidence that Ruhrgas made false statements at the meetings or that the alleged tortious conduct was aimed at activities in Texas*." (Emphasis added.) *Id.* at 295.

¶ 196    *Marathon* is a case from the Fifth Circuit, and instead of holding that telephone calls to the forum state are, *per se*, jurisdictionally insignificant, the Fifth Circuit has held that "[a] single act" by the nonresident defendant, such as a telephone call, "can be enough to confer personal jurisdiction if that act gives rise to the claim being asserted." *Lewis v. Fresne*, 252 F.3d 352, 358-59 (5th Cir. 2001); see also *Burger King*, 471 U.S. at 475 n.18 ("So long as it creates a substantial connection with the forum, even a single act can support jurisdiction." (Internal quotation marks omitted.)). If the communication with someone in the forum state "did not actually give rise to a cause of action"—if the communication "merely solicited business from the forum [state], negotiated a contract, formed an initial attorney-client relationship, or involved services not alleged to form the basis of the complaint"—it would not justify the exercise of personal jurisdiction there, according to the Fifth Circuit. *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 213 (5th Cir. 1999); see also *Isringhausen*, 378 Ill. App. 3d at 1067. But "[i]n cases alleging the intentional tort of fraud," the Fifth Circuit says, "the defendant's participation in a single telephone call is enough to establish personal jurisdiction if the content of the call gave rise to the fraud claim." *FCA Investments Co. v. Baycorp Holdings, Ltd.*, No. 01-20717, 2002 WL 31049442, at *2 (5th Cir. Aug. 29, 2002); see also *Cox v. Foundation Surgery Center of San Antonio, LLP*, No. 1:06CV97-D-D, 2006 WL 3246390, at *3 (N.D. Miss. Nov. 6, 2006).

¶ 197    Likewise, the Illinois Appellate Court, First District, has held: "[I]n cases of fraudulent misrepresentation, reaching out to Illinois residents, whether by mail, telephone, telex[,] or facsimile, with an intent to affect Illinois interests, can be a sufficient basis for exercising personal jurisdiction over a nonresident defendant." *Zazove v. Pelikan, Inc.*, 326 Ill. App. 3d 798, 806 (2001). Only a trivial, formalistic distinction can be made between someone who utters a fraudulent misrepresentation in person and someone who does so on the phone. See *Burger King*, 471 U.S. at 476 ("[I]t is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted. So long as a commercial actor's efforts are purposefully directed toward residents of another State, we have consistently rejected the notion that an absence of physical contacts

- 35 -

can defeat personal jurisdiction there." (Internal quotation marks omitted.)); *cf. Advanced Tactical Ordnance Systems, LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 802 (7th Cir. 2014) (the defendant's maintenance of an e-mail list, which consumers can sign up for online, wherever they happen to be, and which allows the defendant, via the Internet, to "shower past customers and other subscribers with company-related emails[,] does not show a relation between the [defendant] and Indiana" or the defendant's purposeful exploitation of the Indiana market in particular).

¶ 198    As we said, we choose not to base our analysis on the misrepresentation that Johnston allegedly made to Khan, *in the telephone conference of August 2001*, that the distressed debt strategies could legally reduce his income tax. But according to Khan's affidavit, the telephone conference of August 2001 was not the only occasion when Gramercy Advisors made that misrepresentation to him. (We assume that Johnston was acting on behalf of Gramercy Advisors, because Gramercy Advisors was the company that split Khan's fees with BDO.) Khan also states that, as of 2003, Gramercy Advisors had "engaged in continued efforts to solicit more business from [him and his wife]" and that, in the spring of that year, "BDO and Gramercy further advised [him]—in communications with [him] when [he] was in Illinois— that the 2003 Distressed Debt Strategy was legal and provided the same tax benefits found in the 2002 Distressed Debt Strategy." Johnston denies that, in the telephone conference of August 2001, he touted the tax benefits of Gramercy investments, but he does not deny that, on these other occasions, in spring 2003, Gramercy Advisors touted the tax benefits of the 2003 Distressed Debt Strategy.

¶ 199    Setting aside the question of whether Johnston himself ever touted the tax benefits of the distressed debt strategies, it is unrebutted that he touted their financial benefits. According to the complaint, Johnston told Khan "that the Investment Strategies had the required business purpose and economic substance" and that "there was a reasonable likelihood of making a profit on the 'investment' component of the Investment Strategies." Also, in his affidavit, Khan alleges that Johnston told him the distressed debt strategies "could yield a substantial profit." These characterizations of the distressed debt strategies as transactions of economic substance were knowingly false, according to the complaint.

¶ 200    It is important to understand that representations about the economic substance of the strategies were just as significant, if not more so, than representations about the tax benefits of the strategies, because the lack of economic substance is precisely why the losses did not count as deductions. The IRS disallowed the losses because the transactions could not possibly have had any legitimate business purpose, any profit motive. As the Seventh Circuit has said: "A transaction that would make no commercial sense were it not for the opportunity it created to beat taxes doesn't beat them. Substance prevails over form. [Citations.] The question is whether the partners really and truly intended to join together for the purpose of carrying on business and sharing in the profits or losses or both." *Superior Trading*, 728 F.3d at 680. That is why it mattered whether the distressed debt strategies had a purpose other than dodging taxes, as Johnston represented they had.

¶ 201    Part of the expected performance of Gramercy Advisors, under its fee-sharing agreement with BDO, was "assisting in marketing the [t]ransactions to clients" (to quote Shanbrom's affidavit). To do that, Gramercy Advisors surely had to say *something* in favor of the proposed transactions, and the only imaginable selling points are that they could (1) yield a substantial profit or (2) reduce taxes. Presumably, as Khan's fiduciary, Gramercy Advisors would not

have kept telephoning him in Illinois and giving him step-by-step instructions on how to implement the distressed debt strategies but for an underlying understanding with him that the strategies had either or both of those two virtues.

¶ 202    Khan states in his affidavit:

"Gramercy's representatives also participated in many telephone conversations with me (directly and through Plaintiffs' representatives) regarding the implementation of the 2002 Distressed Debt Strategy. During these telephone conversations, Gramercy's representatives, including Johnston, advised me as to the status of the 2002 Distressed Debt Strategy and Plaintiffs' investments in distressed debt and instructed Plaintiffs with respect to carrying out each of the steps of the Distressed Debt Strategies, including when to dispose of distressed debt. I was present in Illinois during these calls."

By these instructional telephone calls, Johnston and others at Gramercy Advisors induced the Khans to increase their financial commitment to the distressed debt strategies, leading them deeper into the morass. See *Asahi*, 480 U.S. at 112 (opinion of O'Connor, J., joined by Rehnquist, C.J., and Powell and Scalia, JJ.) ("establishing channels for providing regular advice to customers in the forum State").

¶ 203                                    G. The Choice-of-Law Clause

in the Investment Management Agreement of 2001

¶ 204    Defendants emphasize that the investment management agreement of 2001 contains a New York choice-of-law clause, which reads as follows: "This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to the principles of conflict of laws thereof."

¶ 205    By drafting and entering into an agreement stipulating that the agreement was to be "governed by and construed in accordance with the laws of the State of New York," Gramercy Advisors purposefully availed itself of the benefits and protections of New York laws. See *Burger King*, 471 U.S. at 482. But that in no way detracts from the fact that Johnston and Gramercy also purposefully availed themselves of the benefits and protections of Illinois laws, as we have discussed (taking the undisputed facts to be true).

¶ 206    By agreeing, in the investment management agreements, that New York law would govern the interpretation of the agreements, Khan did not necessarily agree to refrain from seeking a remedy in Illinois courts. "The issue is personal jurisdiction, not choice of law." *Hanson*, 357 U.S. at 254. A choice-of-law provision in a contract is a relevant but not determinative factor in establishing jurisdiction. *Burger King*, 471 U.S. at 482; *Isringhausen*, 378 Ill. App. 3d at 1066. Illinois courts are capable of applying New York law—as, no doubt, New York courts are capable of applying Illinois law.

¶ 207    The law regards a choice-of-law clause and a forum-selection clause as two separate and distinct things. *In re Marriage of Walker*, 287 Ill. App. 3d 634, 639 (1997). If a choice-of-law clause were effectively a forum-selection clause, there would be no such thing as a forum-selection clause as distinct from a choice-of-law clause.

## H. The Exculpatory Provisions and the Disclaimers

¶ 209    Defendants invoke the exculpatory clauses in the investment management agreements. But the exculpatory clauses (setting aside the question of whether they are effectual in these circumstances) pertain to liability, not jurisdiction. "[J]urisdiction and liability are two separate inquiries." *Central States, Southeast & Southwest Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 944 (7th Cir. 2000); see also *Gramercy Advisors LLC v. Lowery*, No. 01-14-00904-CV, 2015 WL 3981610, at *12 (Tex. Ct. App. June 30, 2015) (by invoking a contractual clause in which the plaintiffs disclaimed reliance on Gramercy's tax advice, the Gramercy defendants "conflate liability with jurisdiction"); Tex. R. App. Proc. 47.7(b) (eff. Sept. 30, 2002) (in Texas civil cases, all opinions issued after January 1, 2003, have precedential value).

¶ 210    Defendants also invoke the side letters, in which Khan disclaimed reliance on the investment manager's financial advice. But if Khan did *not* rely on financial advice from Johnston and Gramercy Advisors, that fact likewise would be irrelevant to jurisdiction because reliance or nonreliance is what *Khan* did or did not do in Illinois. Personal jurisdiction must be based on the *defendants'* contacts with the forum state, not on what the plaintiff did or did not do in the forum state. *Walden*, 571 U.S. at ___, 134 S. Ct. at 1122.

## I. The Reasonableness of Requiring
## Gramercy Advisors and Johnston To Litigate in Illinois

¶ 212    Having decided that Gramercy Advisors and Johnston have made minimum contacts with Illinois, we now must decide whether it would be reasonable to require them to litigate in Illinois. See *Russell*, 2013 IL 113909, ¶ 87. In making that decision, we consider (1) the burden imposed on defendants by requiring them to litigate in a foreign forum, (2) the forum state's interest in resolving the dispute, (3) plaintiffs' interest in obtaining relief, and (4) the interests of the other affected forums in the efficient judicial resolution of the dispute and advancement of substantive social policies. See *id.* (Obviously, by "defendants," we mean, at this point, Gramercy Advisors and Johnston.)

¶ 213    Because defendants have procured hundreds of thousands of dollars from the Khans in Illinois, requiring defendants to litigate in Illinois would not burden them excessively, especially considering that Illinois has a substantial interest in protecting its citizens from fraud. See *Rose*, 713 F. Supp. at 1213.

¶ 214    More than once in their briefs, defendants refer to the Khans' wealth. "Absent compelling circumstances," however, "a defendant who has purposefully derived commercial benefit from his affiliations in a forum may not defeat jurisdiction there simply because of his adversary's greater net wealth." *Burger King*, 471 U.S. at 483 n.25. Illinois has a substantial interest in protecting its citizens from fraud (*Rose*, 713 F. Supp. at 1213), even its wealthy citizens. Because the 2002 and 2003 Distressed Debt Strategies have caused the Khans great financial loss, they have a strong interest in obtaining relief. The interest of Illinois in this case is greater than the interest of Connecticut because the fraud was perpetrated in Illinois and the tax shelter implicated Illinois tax revenues.

¶ 215    In sum, "where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King*, 471 U.S. at 477.

Defendants have not made that compelling case. We are unconvinced it would be unfair, oppressive, or unreasonable to require them to litigate in Illinois. The exercise of personal jurisdiction over them, here in Illinois, does not offend due process.

¶ 216                                    III. CONCLUSION

¶ 217    For the foregoing reasons, we affirm the trial court's judgment in part and reverse it in part: as to Gramercy Advisors and Johnston, we affirm the denial of the motion for dismissal, but as to Gramercy Asset Management, Gramercy Financial, and Tall Ships, we reverse the denial of the motion for dismissal.

¶ 218    Affirmed in part and reversed in part.

¶ 219    STEIGMANN, J., specially concurring.

¶ 220    I fully agree with the majority, as well as the majority's commending the trial court for its detailed, thoughtful analysis that was helpful in resolving this case. Nonetheless, I write this special concurrence because I disapprove strongly of the sealing of court records that occurred in this case at the trial level, as well as the sealing of the briefs the parties filed in this court. In my judgment, both violated settled law.

¶ 221    A statute and several cases address the sealing of court files, and none supports the sealing that occurred in this case, either by the trial court or by this court.

¶ 222    The statute involved is section 16(6) of the Clerks of Courts Act (705 ILCS 105/16(6) (West 2014)), which carries a strong presumption that all court records shall be public and open to inspection.

¶ 223    That statute reads as follows:
> "All records, dockets and books required by law to be kept by such clerks shall be deemed public records, and shall at all times be open to inspection without fee or reward, and all persons shall have free access for inspection and examination to such records, docket and books, and also to all papers on file in the different clerks' offices and shall have the right to take memoranda and abstracts thereto." *Id.*

¶ 224    Over 23 years ago, this court reversed an order of the circuit court of Champaign County that impounded various materials in connection with a personal injury and marital dissolution case. See *In re Marriage of Johnson*, 232 Ill. App. 3d 1068 (1992). The first two sentences of that opinion state the question before this court: "This appeal raises the issue of the public's right of access to trial court records and transcripts. The questions presented are whether what goes on in court is the people's business, and what burden is placed on those who seek to restrict access to public records." *Id.* at 1069.

¶ 225    At issue in *Johnson* was the settlement of a personal injury action brought by the husband, who was a party in the marital dissolution case. The trial court found the personal injury claim to be marital property, and the parties in the dissolution case presented the settlement to the court relating to the distribution of the settlement proceeds from the personal injury case. "The settlement included a term that all documents in the *entire* file were to be sealed." (Emphasis in original.) *Id.* at 1070. The court approved the settlement and sealed the entire court file in both the marital case and the personal injury case. *Id.* The News-Gazette challenged the impoundment orders by asserting a public right of access to court records and the transcripts in

the two cases based on the common law, statutory provisions, and the first amendment. This court's opinion agreed with the newspaper across the board, and we reversed. *Id.* at 1070, 1075.

¶ 226 Although I concurred fully with the judgment of the court in *Johnson*, I wrote a special concurrence to emphasize that, in my judgment, it was not a close case. Without repeating everything I wrote in that special concurrence (to which I still completely adhere), I reiterate the following points: "Whatever the basis for [the parties' preference for sealing a court file]—facilitating settlement, desire for privacy, possible embarrassment of the parties—such preference can *never* demonstrate the compelling interest required to overcome the strong presumption in favor of total access to all documents of whatever nature in a court file." (Emphasis in original.) *Id.* at 1075-76. I wrote that the type of documents that *might* meet the standard of being *both* privileged and *seriously* damaging or embarrassing are psychiatric records revealing aberrational behavior or thinking and the treatment thereof, as well as medical records revealing that a particular person had a sexually transmitted disease. *Id.* at 1076.

¶ 227 Eight years after this court's decision in *Johnson*, the Supreme Court of Illinois addressed the sealing of court files in *Skolnick v. Altheimer & Gray*, 191 Ill. 2d 214 (2000). That court cited *Johnson* (seemingly approvingly), *id.* at 231, and held that "the availability of court files for public scrutiny is essential to the public's right to 'monitor the functioning of our courts, thereby insuring quality, honesty[,] and respect for our legal system.' " *Id.* at 230 (quoting *In re Continental Illinois Securities Litigation*, 732 F.2d 1302, 1308 (7th Cir. 1984)). The supreme court noted further that there is a parallel right of access to court records embodied in the first amendment, which presumes a right to inspect court records. *Id.* at 231-32. The supreme court also rejected the appellate court's conclusion in *Skolnick* that the counterclaim at issue was properly placed under seal because it referred to financial records belonging to one of the parties. *Id.* at 235.

¶ 228 In *A.P. v. M.E.E.*, 354 Ill. App. 3d 989 (2004), the Appellate Court, First District, similarly rejected and overruled the trial court's sealing of records involved in litigation concerning Pritzker family trusts.

¶ 229 Interestingly, this court had a similar experience with Pritzker family interests in *Linn v. Department of Revenue*, 2013 IL App (4th) 121055. The appeal in *Linn* involved some Pritzker family interests in Texas and whether they could be taxed by Illinois authorities. The appellants, representing the Pritzker interests, moved in February 2013 for leave to file their briefs under seal. This court initially granted that motion but issued a rule to show cause in October 2013 against appellants as to why this court's order sealing the briefs should remain in effect. The following month, this court vacated the order that sealed the briefs.

¶ 230 In the present case, the trial court entered a stipulated protective order that sealed the documents the parties filed. In their joint motion to this court, the parties essentially cited the trial court's action and requested the same action by this court. Regrettably, that request was granted, and the parties were permitted to file their briefs under seal. However, as in *Linn*, this court later issued a rule to show cause against both parties as to why this court's order sealing the briefs should remain in effect. Not surprisingly, the parties in response did not even attempt to justify the sealing of the briefs, and this court vacated that order. I say "not surprisingly" because the parties possessed *no colorable basis whatsoever*—before either the trial court or this court—to justify the extraordinary step of sealing court records or briefs.

¶ 231    I write specially because if the experienced, well-regarded trial judge in this case did not understand how the sealing of an entire court file *can never be appropriate*, then the message must be reiterated yet again. Further, I wish to emphasize that both the trial court and this court were disserved by attorneys who should have known better than to even ask for the sealing of court records and briefs.